**UNITED STATES of America, Plaintiff–Appellee,**

v.

**John L. FAULS, III, Defendant–Appellant.**

**No. 94–3659.**

United States Court of Appeals, Seventh Circuit.

Argued May 19, 1995.

Decided Sept. 6, 1995.

Rehearing Denied Nov. 27, 1995.

---

**593**

Barry Rand Elden, Asst. U.S. Atty., John Collins (argued), Office of the U.S. Atty., Criminal Receiving, Appellate Div., Chicago, IL, for plaintiff-appellee.

Michael B. Nash (argued), Schwartz & Freeman, Chicago, IL, for defendant-appellant.

Before CUDAHY, RIPPLE, and KANNE, Circuit Judges.

KANNE, Circuit Judge.

John Fauls was an experienced securities broker who worked for Howe Barnes Investment, in Chicago. In the fall of 1986, Robert Burstein, a friend of Fauls', commented to Fauls how much he liked Fauls' new Mercedes automobile. Fauls replied that there was a way that Burstein could have the Mercedes. Thus began their criminal relationship.

### Factual Background

Fauls met Burstein in a business context in 1981. Burstein was the vice-president for investments and portfolio manager of Security Benefit Life Insurance Company in Topeka, Kansas. Part of Burstein's duties at Security Benefit involved trading bonds and other fixed income securities. During the next several years, the two became close personal friends. Over this time, Burstein confided in Fauls that he felt under-appreciated and, more importantly, under-paid by Security Benefit.

As a result of his dissatisfaction, Burstein left Security Benefit in the spring of 1985 to manage the fixed income portion of Union Carbide Corporation's pension fund. In this position, Burstein continued to use Fauls as a securities broker. To defend itself against a takeover, Union Carbide spun-off the management of its pension funds to a separate corporate entity, Benefit Capital Management Company (BCMC). Burstein became the vice-president and treasurer, as well as a member of the board of directors and executive committee, of BCMC.

Yet this new success was not sufficiently satisfying for Burstein; he still felt under-paid. And it was at about this time that Burstein commented on the Mercedes. Fauls responded that he would give the Mercedes to Burstein as a first payment in return for Burstein using Fauls to execute a set amount of trades for BCMC. They agreed that future payments would also be made. Burstein agreed; to cover up the Mercedes deal, Burstein gave Fauls a check for $10,000, and Fauls gave Burstein $10,000 cash.

Realizing that Burstein was not satisfied with his position with BCMC, Fauls put Burstein in contact with a long-time personal friend of his, James Wells, who had recently purchased Cosmopolitan National Bank in Chicago. For some time, Burstein had wanted to sit on the board of directors of a bank, and, after meeting with Wells, Burstein received a seat on the board. Burstein also purchased approximately three percent of Cosmopolitan's equity. Consistent with common practice, Burstein continued in his position with BCMC while serving as a director of the Cosmopolitan Bank.

In January 1987, shortly after joining Cosmopolitan's board, Burstein began advising Cosmopolitan with respect to securities trades that the bank executed through Howe Barnes. Initially, these trades were successful (Cosmopolitan made approximately $75,000 on the initial short-term trades), and therefore Cosmopolitan agreed to pay Burstein (through a shell corporation nominally held by Burstein's wife) ten percent of the future trading profits that Burstein advised. However, the success streak came to an end. The next two trades that Burstein recommended were unprofitable in the short term, and therefore Cosmopolitan was forced to take the securities into its inventory. Because of the size of the trades, $10 million in total, Cosmopolitan was unable to add to its inventory of securities, forcing Burstein to execute only "day trades." [1]

But this didn't stop Burstein from trading. Instead, he and Fauls devised a scheme, using Burstein's positions at BCMC and Cosmopolitan, to assure that Cosmopolitan's trades would be profitable. They used two methods to rig the trades. The first is what the government called "interposition" trades. With these trades, on days when the market went up for a security being sold by Burstein on behalf of BCMC, rather than simply having BCMC sell on the open market at the highest price, Fauls would create trading tickets to make it appear that BCMC had sold to Cosmopolitan at a lower price earlier in the day, and that Cosmopolitan then sold to the market at the higher price later in the day.

The second type of rigged trades were called "allocation" trades. With these trades, Fauls would purchase a security at the beginning of the day without designating the purchaser. Then, if the market price for the security rose, Fauls would sell it and allocate the gain to Cosmopolitan by indicating that

---

1. A day trade, as the term was used in the trial below, is a trade in which a buyer anticipates that the price or value of a security will rise that day and the buyer therefore buys the security at the beginning of the trading day and sells it at the end of the trading day or the next day.

Cosmopolitan had bought the security at the beginning of the trading day. If the price fell, Fauls would allocate the trade to BCMC, which would then take it into its inventory.

Fauls and Burstein continued this pattern of trading throughout 1987 and 1988. In addition to the trade rigging, Fauls continued to make payments, monthly at some points, to Burstein for using Fauls as a broker for BCMC trades. The last bribe was in the form of an extra $5,000 that Fauls paid to Burstein for a fishing boat. This occurred in the fall of 1990. In total, Fauls paid Burstein approximately $200,000. To explain why they stopped the bribery scheme, Burstein gave the following explanation:

A—By that time things at Benefit Capital Management Company had really changed dramatically and my need and desire for that cash was not as great as it was when it began.

Q—When you said things at Benefit Capital Management had changed dramatically, what was your salary by late 1990, if you recall?

A—Okay. By late 1990 my salary was probably in excess of $150,000 a year plus bonus. In addition we were busy in dealing in other areas as well, we Benefit Capital Management Company.

Q—Well, what do you mean by saying in addition you were busy dealing in other areas?

A—Well, I mean in addition to the trading which I was doing, we were also in the process of marketing our services, which is an area that I was responsible for.

Q—And did that marketing of your services hold out the promise of additional income?

A—Yes, because we were also in the process of discussing with the corporation equity ownership in BCMC, and the opportunity to solicit outside business created an opportunity for us to have a larger compensation package.

Toward the end of 1988, Howe Barnes began to investigate the interposition trades. Due to this investigation, Fauls discontinued the interposition trades. In the beginning of 1990, Fauls and Burstein stopped making the allocation trades as well. Burstein explained why they stopped rigging trades.

A—Okay. Early in 1990 several things were taking place. One is that Jim Wells was in the process of being removed from the board of directors by the federal regulators. There was an awful lot of press in Chicago here about Cosmopolitan Bank. And John decided that it would be appropriate for us not to continue trading for the Cosmopolitan.

Q—Were there other reasons why you let this opportunity go?

A—Yes. The financial condition of the bank was not as good as it was, so, therefore, the opportunity was not as great. And also equally significant is my career path at Carbide had taken off and was improving rather significantly.

*Proceedings Below*

Fauls and Burstein were named in a seventeen count indictment in August of 1993. Burstein pleaded guilty to the indictment, and thereafter cooperated with the government in its prosecution of Fauls. A fifteen count superseding indictment was returned. The indictment charged Fauls with five counts of mail fraud, five counts of securities fraud, four counts of pension fund bribery, and one count of criminal racketeering. After a ten day trial, the jury convicted Fauls of mail fraud, securities fraud, criminal racketeering, and one of the four counts of pension fund bribery. The district court sentenced Fauls to 57 months imprisonment, followed by 36 months of supervised release. Fauls will also be required to perform 2000 hours of community service and to pay BCMC $3,320,000. Fauls appeals a number of the district court's evidentiary rulings and jury instructions.

*Evidentiary Rulings*

■ We review a district court's evidentiary rulings deferentially. *United States v. Foster*, 30 F.3d 65, 67 (7th Cir.1994). We will reverse the trial court only "where no reasonable person could take the view adopted by the trial court." *United States v. Manos*, 848 F.2d 1427, 1429 (7th Cir.1988).

■ Fauls claims that the district court erred by not allowing him to present to the jury two demonstrative exhibits. The first, referred to as the "American Midwest Bank" exhibit, was a chart summarizing 68 trades made by the American Midwest Bank between January 1985 and September 1986. Of these 68 trades, 66 were profitable. Fauls wanted to present this exhibit to rebut the government's expert witness' testimony that a sixty percent success rate was as high as one was likely to achieve on day trades. The government argued that, because American Midwest Bank used a different trading strategy and traded different types of securities than did Burstein and Fauls, the jury was likely to be confused by the exhibit. The district court, in a Solomonic decision, did not allow Fauls to use the demonstrative exhibit, but did allow the defense to have an expert testify that American Midwest was successful on approximately 80–88% of all of its trades. In fact, Fauls' expert, Brent Campbell of Coopers & Lybrand, testified that American Midwest experienced an 88% success rate.

The district court did not err in refusing to allow the introduction of Fauls' demonstrative exhibit. Fauls admits that American Midwest traded in securities with different maturity lengths and used a different trading strategy than Cosmopolitan. He believes, however, that the amount of confusion these differences would create could have been cleared up on cross-examination. While this is a rational argument, we cannot say that "no reasonable person could take the view adopted by the trial court." The trial court believed that the probative value of the exhibit was substantially outweighed by the risk of jury confusion, see FED.R.EVID. 403, and we hold that ruling was reasonable.

■ Similarly, Fauls argues that the district court erred in refusing to allow him to use a demonstrative exhibit referred to as "An Analysis of Union Carbide Day Trades Away from Howe Barnes." This exhibit purported to show that Union Carbide made 52 successful "day trades" in a row during the period from January 1987 through October 1990. For two reasons, the district court ruled that Fauls would not be allowed to use the exhibit. First, Fauls failed to produce the exhibit in a timely fashion; he waited until eight days into the trial to turn it over to the government. Second, the district court ruled that the risk that the jury would be confused by the exhibit substantially outweighed its probative value. Again, Cosmopolitan was forced to use a trading strategy different from the strategy used by Union Carbide. Union Carbide's day trades were what the government terms "opportunistic" day trades. If the value of the security rose during the day, Union Carbide would sell and realize a profit. However, if selling would not be profitable, rather than taking a loss, Union Carbide would take the security into its inventory. Therefore, Union Carbide would, by definition, only show winning "day trades."

We believe the district court was correct in both of its reasons for refusing admission of the exhibit. Fauls has offered no reason for his delay in providing the exhibit to the government. In his reply brief, he makes the strained argument that the government had as much access to the Union Carbide's trading history as did Fauls, and, therefore, it should not have been surprised by the exhibit. Such reasoning is fallacious. The existence of the trades is not what would surprise the government; the selection of these specific trades in the exhibit and the "spin" put on them by Fauls is what would require time for the government to address. Moreover, as in the American Midwest Bank exhibit, the district court made a reasonable ruling that the jury would have been confused by the differing trading strategies of the two companies.

Fauls argues that the district court erred in granting the government's motion *in limine* regarding two draft letters written by the law firm Schuyler Roche & Zwirner for Howe Barnes (hereinafter referred to as the SRZ letters). The SRZ letters were drafted in response to Howe Barnes' investigation into Burstein's trading practices. The letters indicated that it was Schuyler Roche's belief that if both Cosmopolitan and BCMC knew of Burstein's activities, no conflict of interest existed. The district court ruled that whether Fauls would be able to introduce the SRZ letters on cross-examination would depend on

how Burstein testified. The district court noted, however, that, depending on whether Fauls decided to rely on an "advice of counsel" defense, the SRZ letters might be admissible during Fauls' case.

On direct examination, Burstein testified that he and Fauls had discussions concerning the investigation and that Fauls sent him "materials" concerning the investigation. These "materials" were the SRZ letters, but Burstein never described the materials or indicated their content. Burstein also testified that due to the conversations and the materials, Fauls and he decided to cease conducting interposition trades.

■ Following the direct examination of Burstein, the government again moved *in limine* to prevent Fauls from introducing the SRZ letters during cross-examination. The district court granted the motion without objection from Fauls, but again noted that the ruling only prevented Fauls from cross-examining on the letters. By failing to object, Fauls has forfeited this claim, and we review for plain error under Federal Rule of Criminal Procedure 52(b). *United States v. Lilly*, 37 F.3d 1222, 1225 (7th Cir.1994). We will reverse for plain error only to prevent an "actual miscarriage of justice." *Id.* Moreover, the Supreme Court has instructed that an error is plain if it "seriously affect[s] the fairness, integrity or public reputation of the judicial proceedings." *United States v. Olano,* — U.S. —, —, 113 S.Ct. 1770, 1779, 123 L.Ed.2d 508 (1993).

■ For us to order a new trial under the plain error standard of review, Fauls must show: 1) that the district court's ruling was error; 2) that the error was plain, clear or obvious; and 3) that the error affects substantial rights. *See Olano,* — U.S. at —, 113 S.Ct. at 1777–78. Regardless of whether we would determine, on *de novo* review, that the district court erred in refusing to allow Fauls to introduce the SRZ letters on cross-examination, any error was not obvious. The government had a number of at least colorable objections to their introduction on cross-examination, including relevance and hearsay. Therefore, the district court did not plainly err.

■ Finally, Fauls argues that the district court erred by admitting testimony about a conversation between Patrick Meade, a co-worker of Fauls, and Fauls prior to the beginning of the charged scheme. At trial, Meade described the conversation he had with Fauls in 1985:

Prosecutor—And what comment did Mr. Fauls tell you Mr. Burstein made?

Meade—When they pulled up at Mr. Fauls' home, Mr. Burstein saw [Fauls'] Mercedes and made the comment that a Mercedes would look very nice on his driveway, too.

Prosecutor—After John Fauls related that conversation to you, did he ask you anything?

Meade—Yes.

Prosecutor—Please describe it.

Meade—He had mentioned that he had done a lot of business with Mr. Burstein and wondered how I would handle it.

Prosecutor—Did you have a response?

Meade—Shock.

Prosecutor—Did you [say] anything?

Meade—Yes. I said: "John, you don't have to ask the question."

In discussing the testimony's admissibility at side bar, the government argued that the testimony was being offered to show Fauls' state of mind. Fauls' argued that the conversation was too temporally remote to be relevant. After deliberation, the district court ruled that, because of the lengthy relationship between Fauls and Burstein, the conversation was relevant to Fauls' state of mind.

On appeal, Fauls makes a skeletal argument that the district court erred. In response to the government's observation that Fauls failed to "provide any indication as to how or why those statements were 'highly prejudicial' to him," Fauls meagerly retorts, "One need only look to the Government's argument to the trial court justifying this testimony and to the prosecutor's final argument to the jury. This conversation was very prejudicial to Fauls. It put in the jury's mind the idea that Burstein had asked Fauls for a bribe." Although the conversation

could be interpreted in different ways, the jury could have concluded that Fauls believed that Burstein was asking for a bribe and was unsure what to do. We are hard pressed, as Fauls appears to be, to understand how this testimony was impermissible. It was not.

### Jury Instructions

Fauls alleges that the district court erred in giving a "deliberate indifference," commonly referred to as an "ostrich," instruction. Fauls does not claim that the instruction itself was flawed, but that insufficient evidence supported the giving of the instruction. We review the evidence in the light most favorable to the government, making all reasonable inferences in its favor. *United States v. Hoyos,* 3 F.3d 232, 237 (7th Cir. 1993).

■ The ostrich instruction is properly given in cases "in which there is evidence that the defendant, knowingly or strongly suspecting that he is involved in shady dealings, takes steps to make sure that he does not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires." *United States v. Giovannetti,* 919 F.2d 1223, 1229 (7th Cir.1990). Fauls claims that no evidence was adduced at trial that he took deliberate, affirmative steps to avoid knowledge of Burstein's "shady dealings." The government counters that this court has consistently held that deliberate indifference to the truth does not require *physical* avoidance, that "mental, as well as a physical, effort—a cutting off of one's normal curiosity by an effort of will," will suffice to justify an ostrich instruction.

■ Fauls rejoins that the government's theory of the case throughout the trial was that Fauls and Burstein were in cahoots, and thus, to offer to the jury an alternative theme—that Fauls deliberately avoided knowledge—is somehow unjust. But this is only true if the prosecution, regardless of what its "theory" appears to be, puts on no evidence to support the instruction. And in this case, viewing the record in the light most favorable to the government, the prosecution introduced enough evidence to support the ostrich instruction.

Fauls admits that Burstein executed approximately forty cross-trades of thirty year zero coupon government bonds between BCMC and Cosmopolitan and that Cosmopolitan profited on each trade by reselling the security the same day. It is also undisputed that Fauls knew that Burstein worked for both Cosmopolitan and BCMC. Considering the government's expert's testimony that a 60% success rate was very good, Cosmopolitan's 100% success (and BCMC's concomitant 100% failure) must have raised a red flag in Fauls' mind, knowing that Burstein was on both sides of the trades. In fact, Howe Barnes' compliance director, Alexander Rudolph, testified that these very factors caused him to question Fauls about the trades.

Moreover, the government presented evidence about the specific type of trades that Fauls and Burstein were conducting that made them even more suspect. The government introduced evidence that long term, zero coupon government bonds (also known as strips because they have been "stripped" of the interest income) are not commonly cross-traded. Michael Ochoa, another fixed income security trader at Howe Barnes, testified that he had never conducted such a trade. David Matthews, the government's securities expert, testified that long-term strips are usually bought from a primary dealer, a brokerage company that specializes in buying and selling government bonds. Additionally, Matthews testified that strips are not commonly day traded; most people that buy strips are in it for the long-haul. Taken as a whole, the government's evidence was sufficient to support the ostrich instruction.

■ We caution that the ostrich instruction is not applicable to every case in which the defendant denies knowledge of a conspiratorial endeavor. The instruction is only proper when the actions of the alleged co-conspirator and the surrounding circumstances indicate that the only way the defendant could not have known of the illegal activity is by affirmatively avoiding the

knowledge. Courts must be careful to avoid allowing a jury to convict merely because the defendant was negligent. *See United States v. Stone*, 987 F.2d 469, 472 (7th Cir.1993).

Fauls also claims that the district court erred by giving an "aiding and abetting" instruction. Similar to his argument concerning the ostrich instruction, he claims that the government's theory of the case was that Fauls was a participant in the scheme, not merely an aider or abettor. But as long as the government introduces evidence at trial that would support a conviction under the theory, "[a]iding and abetting need not be specifically pleaded ... as long as no unfair surprise exists." *United States v. Loscalzo*, 18 F.3d 374, 383 (7th Cir.1994). The government introduced sufficient evidence on which the jury could find the elements of aiding and abetting ("knowledge of the crime being aided and abetted, a desire to help the activity succeed, and some act of helping," *United States v. Carson*, 9 F.3d 576, 586 (7th Cir.1993)), and Fauls does not explain how any unfair surprise exists.[2]

### Conclusion

There was no error either in the evidentiary rulings by the district court or in its instructions given to the jury.[3] The conviction of John L. Fauls, III is AFFIRMED.

---

2. On appeal, Fauls claims that the district court erred in its instruction to the jury concerning the elements and definition of a scheme to defraud. He, however, neither objected at trial nor offered his own instruction and has therefore forfeited the claim, subject to plain error review. Viewed as a whole the instruction is an accurate summary of the law (as his counsel concedes), and no plain error was committed.

3. The balance of Fauls' arguments are baseless and merit no discussion.