**UNITED STATES of America,**
**Plaintiff–Appellee,**

v.

**Robert AUSTIN, Defendant–Appellant.**

**No. 00–2235.**

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 9, 2000.

Decided Feb. 16, 2001.

Before FAIRCHILD, EASTERBROOK, and MANION, Circuit Judges.

## ORDER

Robert Austin was charged with eight counts of mail fraud, 18 U.S.C. § 1341, mailings for the purpose of executing a scheme to defraud by distributing forged sports memorabilia. A jury found Austin guilty, and the trial court sentenced him to concurrent 30–month terms of imprisonment and ordered him to pay $188,651 in restitution. Austin appeals, arguing that the trial court abused its discretion in giving an ostrich instruction and in admitting into evidence and sending to the jury room numerous items of sports memorabilia bearing the purported signatures of professional basketball star Michael Jordan. Austin also maintains that the trial court committed plain error by failing to hold a hearing to investigate a report of improper advice given by a court security officer to the jury foreperson. We affirm.

## Background

Construing the evidence in the light most favorable to the verdict, the facts are as follows: Robert Austin, his brother Gary, and Michael Anderson formed Overtime Prowear, a sports memorabilia and athletic supply business, in late 1994. Austin, who had previous experience in the sports memorabilia industry, oversaw Overtime's sports memorabilia operations. On behalf of Overtime, Austin obtained large quantities of signed memorabilia from suppliers, including Mike Lopez, Laith Nesson, and Anthony Alyinovich. Overtime sold memorabilia at its place of

business in Huntington Beach, California, and also filled mail orders received in response to advertisements published in a weekly national sports collector's digest.

Although Anderson principally oversaw Overtime's athletic supply business, he was familiar with the sports memorabilia industry and began to question the authenticity of the signatures on the items coming from Austin's suppliers. Anderson told Austin on several occasions that he thought the signatures were illegitimate and questioned one of Austin's suppliers about the authenticity of the signatures. Austin, however, readily dismissed Anderson's concerns and told him to mind his own business. Austin threatened to expose Anderson's illegal bookmaking operation. Still dubious, Anderson (and by this time Gary too) proposed to Austin in May 1995 that they split Overtime's operations. Austin at first refused, but within a week he had removed all inventory and equipment from Overtime's business premises while Anderson was out of town.

Austin continued dealing in memorabilia out of a different place of business, still under the name Overtime Prowear. His relationship with one particular supplier, Anthony Alyinovich, grew. Alyinovich ran a sports memorabilia business out of Chicago called Bridgeport Collectibles. From the spring of 1995 until mid–1996, Alyinovich provided Austin thousands of signatures of prominent sports figures. Michael Jordan's signature appeared with the greatest frequency–Alyinovich supplied Austin over 2,000 purported Jordan signatures. Alyinovich promptly filled Austin's orders too–all within a week–regardless of the size of the order, the time of year (off-season, regular season, playoff season), the athletes and teams involved, and the location of athletes and teams involved.

Alyinovich's promptness had one simple explanation–he had ready access to a team

of forgers, and every signature he supplied to Austin was forged. The cost to Alyinovich was minimal. For example, for each Jordan signature, Alyinovich paid the forgers between $2 and $20. In turn, Alyinovich charged Austin $20 to $45, even though at the time the going dealer rate for a genuine signature was $200 to $300.

Unbeknownst to Alyinovich, they became the subjects of a federal investigation targeting dealers of forged sports memorabilia. From May to June 1996, the FBI intercepted eight shipments that had been sent by Alyinovich to Austin. Those shipments contained numerous items of memorabilia bearing the forged signatures of several professional athletes (including 730 forged Jordan signatures). Agents inventoried and secretly marked the items in each shipment before sending them on to Austin. To determine whether Austin was reselling the memorabilia, an agent acting as a customer called Austin on June 5 and ordered various items of memorabilia supposedly signed by Jordan. The order was delivered on June 22 and included a "Certificate of Authenticity." After inspecting the items, the agent confirmed that the goods were part of the earlier intercepted shipments.

The FBI next obtained a search warrant for Alyinovich's business premises. During the search, agents found thousands of items of forged memorabilia. Unfortunately for Austin, Alyinovich agreed to cooperate with the government and made several recorded calls to Austin between June 26 and July 1, 1996. Although Alyinovich had never before told Austin that he was supplying him forged signatures, Alyinovich became more explicit during the recorded conversations. He told Austin, "[M]y guy signs all the Jordan stuff for Field of Dreams [retail store]" and, "[A]ll of the Field of Dreams [stuff] is phony." Austin responded, "I know, I know."

They also discussed rumors that an investigation had been conducted at a national sports memorabilia convention that Austin had attended a few weeks earlier. Offering a possible explanation for the investigation, Alyinovich said, "[T]hey're not happy with all the Jordan stuff out there." Austin remarked, "Too much of your stuff?" Austin and Alyinovich then discussed how to respond in the event the authorities started asking questions. Alyinovich asked, "[W]hat's your story going to be?," and Austin responded, "Well, what should it be?" Austin then said that he could always say that he "got guys that went to the games and stuff like that." Alyinovich remained wary though: "[B]ut ... if ... they ever came to your place and they see that you have [$]100,000 in inventory, then it's a different story, you know, because ... everybody knows Jordan never signed ... quantities like that." Austin simply replied, "Yeah." Alyinovich then attempted to reassure Austin of the quality of the Jordan signatures; he said, "I'm not worried about them looking at the Jordan signatures, because ... you look at them, I mean, Jordan couldn't even tell." But Austin knew that Jordan had executed an exclusive signing contract with Upper Deck, a prominent manufacturer and distributor of sports memorabilia, that precluded him from signing autographs other than for Upper Deck. Austin thought that "as long as ... Jordan says ... that he signs on the side, I don't think there's nothing to worry about. But if Jordan comes out and says, 'Hey, I never signed anything but for Upper Deck,' then you got a problem."

The FBI obtained a warrant to search Austin's business premises in Huntington Beach, California. During the July 2, 1996 search, agents seized only those items bearing Jordan's purported signature, including basketball and baseball jerseys; basketball, tennis, and golf shoes; basketballs; and individual numbers that could be affixed to clothing. In total, over 1200 "Jordan" signatures appeared on these items. Agents also seized the certificates of authenticity that accompanied the memorabilia.

## Analysis

Austin first maintains that the trial court erred in giving an ostrich instruction asserting that the government presented no evidence that he purposefully avoided learning that the autographs were forged. We review Austin's claim for abuse of discretion, and look for whether there is evidence to support an inference of deliberate ignorance. *United States v. Wallace*, 212 F.3d 1000, 1004 (7th Cir.2000); *United States v. Craig*, 178 F.3d 891, 896 (7th Cir.1999).

■■■ The ostrich instruction is intended to convey to a jury that deliberate avoidance of knowledge is the equivalent of actual knowledge. *Craig*, 178 F.3d at 896. Thus a defendant may not evade criminal responsibility simply by pleading ignorance where he knows or strongly suspects that he is involved in shady dealings, but deliberately avoids taking steps to learn more about the nature or extent of those dealings. *Wallace*, 212 F.3d at 1004; *United States v. Fauls*, 65 F.3d 592, 598 (7th Cir.1995). The instruction is proper when a defendant claims a lack of guilty knowledge and there is evidence to support an inference of deliberate ignorance. *Wallace*, 212 F.3d at 1004.

■■ The trial court did not abuse its discretion in giving the ostrich instruction. Austin did not testify at trial, but his theory of defense was that he lacked guilty knowledge. The evidence at a minimum, however, supports an inference that he deliberately avoided learning that the signatures were forged. Anderson planted

the seed of suspicion early on, telling Austin on numerous occasions that he thought that the signatures were bogus. Yet in response Austin did not express surprise, nor did he make any effort to confirm the authenticity of the signatures. Instead, he resorted to threats to expose Anderson's illegal bookmaking operation, told Anderson to mind his own business, and ultimately severed all ties with him. Nevertheless, Austin persisted in his memorabilia dealings.

But the circumstances surrounding those dealings, specifically with Alyinovich, only grew more suspicious. Alyinovich had what seemed to be a virtually limitless supply of signatures, and he filled Austin's orders with such speed that Austin must have known the signatures were phony. Most notably, Alyinovich had a remarkable ability to provide countless Jordan signatures, a practice that was irreconcilable with the reality that Jordan was under an exclusive signing contract with Upper Deck. Although there was evidence that Jordan would honor individual requests for signatures, the jury could find that Austin could not have believed this accounted for the Jordan signatures supplied by Alyinovich. Moreover, Alyinovich sold the Jordan signatures to Austin at suspiciously low prices. We find this evidence sufficient to support an inference of deliberate ignorance.

■ Although the government also presented evidence of actual knowledge, the trial court still did not abuse its discretion in giving the ostrich instruction. As long as both actual knowledge and deliberate indifference are supported by the evidence, the ostrich instruction is appropriate. *United States v. Broeske,* 178 F.3d 887, 890 (7th Cir.1999); *Wilson,* 134 F.3d at 868; *United States v. Farouil,* 124 F.3d 838, 844 (7th Cir.1997). And, here, the government presented evidence that Aus-

tin knew Alyinovich was supplying forged signatures. During the recorded conversations, when Alyinovich told Austin, "[M]y guy signs all the Jordan stuff for Field of Dreams" and, "[A]ll of the Field of Dreams [stuff] is phony," Austin said, "I know, I know." When Alyinovich brought up rumors of an investigation at the memorabilia convention, Austin remarked, "Too much of your stuff?" When strategizing how to respond to questions from investigators, Austin thought he could rebuff them by saying that he "got guys that went to the games."

■ We also reject Austin's challenge to the wording of the instruction. The trial court gave Seventh Circuit Pattern Jury Instruction 4.06 in its entirety, including the last sentence: "You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth." During the jury instruction conference, Austin requested that the trial court include this sentence to avoid lowering the government's burden of proof. Now he argues that the very "modification" he requested lowered the government's burden of proof. But having approved the wording of the instruction given by the trial court, he cannot now claim error on appeal. *See United States v. Griffin,* 84 F.3d 912, 924 (7th Cir.1996) (acceptance of instruction equated to approval of that instruction and constituted a waiver of any objection to instruction on appeal).

■ Austin's challenge to the trial court's decision to admit the memorabilia seized during the July 1996 search is equally unavailing. Austin submits that the government failed to prove that all of the 1200 signatures were forged and therefore this evidence was highly prejudicial, lacked probative value, and was unreliable. We review the trial court's decision to admit this evidence for abuse of discretion, *Unit-*

ed States v. Smith, 223 F.3d 554, 569–70 (7th Cir.2000); United States v. Montani, 204 F.3d 761, 765 (7th Cir.2000), and we find no abuse of discretion here. Whether Austin knew that he was dealing in forged memorabilia was the key issue in this case, and the admitted evidence was highly probative and relevant to his knowledge. See Fed.R.Evid. 401 (defining relevant evidence as "evidence having any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence"). The government presented evidence that Austin knew that Jordan was under an exclusive signing contract with Upper Deck, and his possession of over 1200 Jordan signatures in itself tended to show at a minimum that he must have known or at least strongly suspected that the Jordan signatures were forged. Given that this evidence was highly probative of Austin's knowledge, we see no basis for concluding that the evidence was unfairly prejudicial, Fed.R.Evid. 403. And to the extent Austin also suggests that the trial court further abused its discretion by permitting the jurors to examine the admitted memorabilia during deliberations, he has waived this argument. Austin agreed to allow this evidence to go back to the jury.

▪ Austin lastly objects to the trial court's handling of a letter received from the jury foreperson six weeks after the jury rendered its verdict. In that letter, the jury foreperson (who happened to be a nonpracticing attorney) explained that she had a conversation with a court security officer before the other jurors had arrived the final morning of deliberations. According to the foreperson, she was reviewing the jury charge when the officer remarked that she need not take the instructions too seriously. After the foreperson told the officer that she knew the instructions were important, the officer replied that what he meant was that the instructions did not have to be followed in detail and that what the jury was supposed to do was read the charge as a whole and get a feeling for the whole thing. The foreperson went on to explain in the letter that the communication had not affected her deliberations. She said, "When deliberations resumed ..., I proceeded exactly as I would have had he said nothing. I knew exactly how important the instructions were to me, I applied them in all their detail to my own decision process, and I did my best throughout the day to get the entire jury to do the same thing." The foreperson further indicated that she had not shared the communication with other members of the jury.

After receiving the letter, the trial judge confronted the officer about the conversation, and he told the judge that he would not have said anything improper. The judge then discussed the content of the letter with counsel in open court and told them about her follow-up communication with the officer, observing that if he "said such a thing, [he] is wrong." After further observing that the foreperson could not remember the "exact words" of the conversation, the judge went on to say that if the officer did indeed make the remarks, "this is a lawyer, and ... she gave the appropriate response, and she says it didn't affect her ... and that she also didn't say anything." The court next said, "If you want to read the whole letter, in fact I will take a break and come back here in five minutes. I will also ... let you call her." But Austin's counsel took the opportunity to argue his motion for acquittal and to discuss certain sentencing issues. After hearing those issues, the judge brought up the letter again: "Should I just leave this [the letter] with you, and if you want to call [the jury foreperson], or do you want—if you file something I'll look at it." Aus-

tin's counsel took the letter and the jury foreperson's phone number. Austin, however, never pursued any of the avenues offered by the judge and never objected to the manner in which the judge handled the letter.

Relying on *Remmer v. United States*, 347 U.S. 227, 74 S.Ct. 450, 98 L.Ed. 654 (1954), Austin now argues that the trial judge committed plain error by failing to hold a hearing to determine the prejudicial effect of the communication. *Remmer*, however, involved a situation where the trial court failed to disclose to the defendant that an unknown individual had offered a bribe to a juror and determined ex parte that the contact was harmless. The Supreme Court denounced this practice, reasoning that a trial court "should not decide and take final action ex parte on information ... but should determine the circumstances, the impact thereof upon the juror, and whether or not it was prejudicial, in a hearing with all interested parties permitted to participate." *Id.* at 229–30, 74 S.Ct. 450.

Here, the trial judge did not take the sort of ex parte action before the Supreme Court in *Remmer*. Instead, the judge immediately told counsel that she had received the letter and offered to counsel her own thoughts about it. Although the judge seemed skeptical of the foreperson's account, she evidently felt that the communication had been harmless because the foreperson gave the "appropriate response" and had represented that the remarks had not affected her deliberations. We are confident from this record that the trial judge was prepared to conduct further proceedings if Austin requested. Through inaction, he acquiesced in the trial court's evident belief that his rights were not prejudiced and has thereby relinquished his right to appellate review. *United States v. Olano*, 507 U.S. 725, 733,

113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (waiver is intentional relinquishment or abandonment of known right); *United States v. Staples*, 202 F.3d 992, 995 (7th Cir.2000); *see also United States v. Walker*, 160 F.3d 1078, 1083 (6th Cir.1998) ("[A] defendant who waits until appeal to request a [*Remmer*] hearing bears a heavy burden, since the defendant has thereby effectively deprived [the] court of any basis for concluding that a hearing would be necessary, and asks us to presume that the district court would not have acceded to such a request, and would have done so for erroneous reasons.").

AFFIRMED.