

1995 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

4-13-1995

# United States v Hunter

Precedential or Non-Precedential:

Docket 94-5461

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1995

Recommended Citation

"United States v Hunter" (1995). *1995 Decisions.* Paper 92.
http://digitalcommons.law.villanova.edu/thirdcircuit_1995/92

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova University School of Law Digital Repository. It has been accepted for inclusion in 1995 Decisions by an authorized administrator of Villanova University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT


Nos. 94-5461 and 94-5462


UNITED STATES OF AMERICA

v.

VANESSA HUNTER,
                    Appellant


On Appeal from the United States District Court
for the District of New Jersey
(D.C. Nos. 94-cr-00016 and 94-cr-00139)


Argued February 16, 1995
BEFORE:  STAPLETON and COWEN, Circuit Judges
         HUYETT, District Judge*


(Filed  April 13, 1995)


Victor Ashrafi (argued)
Office of United States Attorney
970 Broad Street
Room 502
Newark, New Jersey  07102


Paul H. Zoubek
Room 2070
Office of United States Attorney
4th & Cooper Streets
Mitchell H. Cohen Courthouse
One John F. Gerry Plaza
Camden, New Jersey  08101

        COUNSEL FOR APPELLEE
        UNITED STATES OF AMERICA

John M. Holliday (argued)
Paglione & Massi
2662 Nottingham Way
Trenton, New Jersey  08619

        COUNSEL FOR APPELLANT
        VANESSA HUNTER


                        OPINION



COWEN, <u>Circuit Judge</u>.

        Vanessa Hunter appeals from final orders of the United States District Court for the District of New Jersey, which imposed: (1) two concurrent terms of imprisonment of eighteen months each, and a three year period of supervised release; and (2) restitution in an aggregate amount of $75,000 as a condition of supervised release.  Because the district court properly applied Guideline Section 3B1.1 in finding that Hunter was a manager of a criminal conspiracy and subject to a two level enhancement pursuant to Section 3B1.1(c), we will affirm those portions of the orders of the district court.  On Hunter's claim that the district court failed to make the required factual findings to support its restitution orders, however, we will reverse and remand.


                        I.

Nu Skin International of Provo, Utah, markets Nu Skin skin-care products through a multi-level network of independent distributors, buying wholesale and selling at a markup. To expand its distributor network, the company encourages sponsorship of new distributors; as new distributors are recruited, sponsors are promoted to "executive" or "upline" distributors of the new "downline" distributor. Nu Skin pays monthly commissions to upline executives whose downline distributors attain a target sales volume.

Hunter began selling Nu Skin in the summer of 1990, and she signed as a downline distributor of Joseph Fanelli. Hunter contends that Fanelli assumed total control over Hunter's daily affairs, including controlling her business matters and personal checking account. She maintains that her tolerance of Fanelli's control was based on her dependent nature and the promise that Fanelli would make Hunter a successful upline distributor.

Fanelli urged Hunter to locate sources of credit card account numbers. Fanelli and Hunter planned to use these account numbers to purchase Nu Skin products, which they would then sell on consignment in health centers and hair salons. Thereafter, in the late summer or early fall of 1990, Hunter telephoned a friend, Martin Guzman. After Guzman said he did not have access to credit card data, Hunter urged him to recruit as her source Roel "Roy" Trevino, an employee of the St. Anthony Hotel in San Antonio, Texas. Over the following few weeks, Hunter discussed the matter several times with both Guzman and Trevino, and

offered to pay Trevino for every stolen credit card account number.

Hunter maintains that she initially believed that Fanelli would repay Nu Skin as a "loan." She also contends that she feared that Fanelli would physically harm her or her family if she were to disobey him. According to Hunter, Fanelli even boasted of his "ties to the mob" as a means of intimidating her.

Throughout the month of October 1990, Trevino periodically stole credit card data from the St. Anthony Hotel and read it over the telephone to Hunter. Ultimately he compromised the accounts of more than 200 patrons. Hunter paid Trevino by arranging for money to be wired to him in San Antonio. Between October 1990 and December 1991, Hunter, Fanelli, and others working at their direction, used Visa and Mastercard account numbers supplied by Trevino and other sources to place orders for Nu Skin at a total cost in excess of $293,000. Hunter and Fanelli caused orders to be shipped to persons who were willing to hold the shipments until they or any of several accomplices could pick up the shipments. In addition, Hunter and Fanelli caused all fraudulent orders to be made by "distributors" they sponsored, sometimes creating fictitious distributors by executing new distributor agreements using aliases. By placing orders in the names of distributors purportedly sponsored by Hunter and Fanelli, they also caused Nu Skin to issue them checks totalling more than $28,000 for commissions earned on the fraudulent orders.

Fanelli reaped most of the profits from the scheme. Hunter became financially dependent on her sister and eventually was supported by food stamps. She later declared bankruptcy. Since November of 1993, however, Hunter has acquired a job at Fitch Investors in New York where she has continued to work.

The United States filed an information in the District of New Jersey alleging credit card fraud, contrary to 18 U.S.C. § 1029(a)(2), and filed a superseding information in the Western District of Texas, alleging conspiracy to traffic in and use unauthorized access devices, contrary to 18 U.S.C. §§ 1029(a)(2) and (b)(2). Pursuant to Rule 20 of the Federal Rules of Criminal Procedure, the superseding information from the Western District of Texas was transferred to the District of New Jersey.

Hunter and the Government reached a negotiated plea agreement, and she entered her pleas of guilty. When Hunter re-appeared before the district court for sentencing, the district court imposed two concurrent terms of imprisonment, each of eighteen months, and a three-year period of supervised release. Restitution was also ordered in the aggregate amount of $75,000 as a condition of the supervised release. This appeal followed.

## II.

Hunter argues that the district court improperly increased the base offense level by two points upon the erroneous finding that Hunter was a "manager" or "supervisor," pursuant to U.S.S.G. § 3B1.1(c). The determination of Hunter's aggravating role in the offense is essentially factual in nature and,

therefore, we will reverse the findings of the district court only for clear error.  See United States v. Ortiz, 878 F.2d 125, 126-27 (3d Cir. 1989).

Hunter's base offense level was enhanced two levels by the district court under § 3B1.1(c) of the Sentencing Guidelines in order to reflect Hunter's role as a manager/supervisor in the credit card conspiracy.  Section 3B1.1 provides:

> Based on the defendant's role in the offense, increase the offense level as follows:
>
> (a) If the defendant was an organizer or leader of a criminal activity that involved five or more participants or was otherwise extensive, increase by **4** levels.
>
> (b) If the defendant was a manager or supervisor (but not an organizer or leader) and the criminal activity involved five or more participants or was otherwise extensive, increase by **3** levels.
>
> (c) If the defendant was an organizer, leader, manager, or supervisor in any criminal activity other than described in (a) or (b), increase by **2** levels.

U.S.S.G. § 3B1.1.

The guideline commentary lists factors that should be considered by the sentencing court in determining whether to apply the "aggravating role enhancement": (1) the exercise of decision making authority; (2) the nature of participation in the commission of the offense; (3) the recruitment of accomplices; (4) the claimed right to a larger share of the fruits of the crime; (5) the degree of participation in planning or organizing the offense; (6) the nature and scope of the illegal activity;

and (7) the degree of control and authority exercised over others.  U.S.S.G. § 3B1.1, commentary, n.4.  The commentary also acknowledges that more than one person can qualify as a leader of a criminal conspiracy, and emphasizes that the aggravating role enhancement "is included primarily because of concerns about relative responsibility."  Id. & background.

It is stipulated that the entire loss incurred as a result of the scheme totalled approximately $321,000.  The Government does not contest Hunter's assertion that she never possessed a substantial portion of these sums.  Hunter argues that the fact that she led a low-income lifestyle is the most compelling and objective evidence that she was not a "supervisor."

While it may be true that Hunter's low-income lifestyle weighs against the "claimed right to a larger share of the fruits of the crime" factor, we do not believe that considering the record as a whole, the district court was clearly erroneous in its decision to give an enhancement.

The district court imposed on Hunter two points, the lowest enhancement under § 3B1.1.  The district court stated:

> Because if you look at the record, if you look at the presentence report, she is up to her eyeballs here.  She recruited Guzman, Tr[e]vino, she received credit card information from them and others; she used credit card data to place orders for N[u] Skin; she created fictitious distributors; she signed fraudulent credit card slips herself . . . .
>
> Because these are all managerial type things, or at least her role here was clearly managerial.  I mean I suggest that when and

> if Mr. Fanelli is convicted, he will get more than a two point enhancement. He will get at least a three. Because his role was greater than hers. But that is not inconsistent with saying that she too was a manager and supervisor of Guzman, of Tr[e]vino, for starters.

App. at 42-43. The district court also recognized Hunter's argument that her sentence should not be enhanced because she did not profit as much as Fanelli, yet nevertheless was persuaded that based on the facts in the record as a whole, there was sufficient basis for the two point enhancement. App. at 48.

We conclude that there was ample support in the record for the district court's enhancement determination. As the district court found, the fact that Hunter did not receive the bulk of the profits or live a lavish lifestyle as a result of the crime does not change the analysis of her relative individual conduct and culpability. The district court was not clearly erroneous in concluding that Hunter was a manager or supervisor. We will affirm the order enhancing Hunter's sentence by two points.

III.

Hunter also argues that the district court erred in imposing restitution in the amount of $75,000 by not considering Hunter's financial resources and ability to pay. Our review over whether the district court incorrectly imposed an order of restitution is bifurcated; plenary review is exercised over whether the law permits the award, but the particular award is

reviewed for abuse of discretion. United States v. Furst, 918 F.2d 400, 408 (3d Cir. 1990) (citing United States v. Pollak, 844 F.2d 145, 152 (3d Cir. 1988); United States v. Palma, 760 F.2d 475, 480 (3d Cir. 1985)).

Title 18, Section 3664(a) of the United States Code provides:

> The court, in determining whether to order restitution under section 3663 of this title and the amount of such restitution, shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate.

18 U.S.C. § 3664(a) (1988 & Supp. IV 1990). In this regard, the district court stated at sentencing:

> I will impose an order of restitution consistent with what I believe, from the records, will be Miss Hunter's future ability to pay restitution. I recognize she has an $18,000 restitution judgment that's in default now with the state, I recognize she's defaulted on her student loan, I recognize she's been in bankruptcy. I recognize as well though that she has the ability to work. In fact, she is working now and that in the future, at least over the period of supervised release, she'll be able to pay some portion of the restitutionary obligation that would be due here.

App. at 38-39.

The district court subsequently ordered restitution in the amount of $75,000 to be paid during the period of supervised release in installment payments. The court stated, "[t]his

restitutionary obligation is jointly and severally with those of her co-defendants."  App. at 59.

We believe that these findings are insufficient for purposes of determining Hunter's ability to pay restitution.  We note that a defendant's current indigency is not determinative in calculating a restitution order.  Congress recognized that indigency may be temporary and, if necessary, even an indigent offender may be compelled to pay restitution.  United States v. Carrara, No. 94-5204, 1995 WL 75853, at *4 (3d Cir. Feb. 27, 1995) (citing 18 U.S.C. § 3572(d)).  However, the district court failed to make the necessary factual findings on all factors bearing on Hunter's current and future ability to pay $75,000 in restitution.  Based on the admittedly limited record on appeal before us, we can perceive no reasonable basis for believing that Hunter will be able to discharge the obligation of restitution that the district court has ordered.

We recently discussed the purposes of restitution in Carrara:

> Restitution has customarily been awarded to answer various penological concerns.  It is primarily restorative and is supposed, at least partially, to replace victims in the financial position they occupied before the offense was committed against them.  See generally S.Rep No. 532, 97th Cong.2d Sess. 30, reprinted in 1982 U.S.C.C.A.N. 2515, 2536-39.  In that sense, restitution is also remonstrative, and, where indicated, will require that offenders disgorge their illgotten gains.  United States v. Woods, 986 F.2d 669, 678-81 (3d Cir. 1993).  Then too, restitution is rehabilitative because it permits or indeed requires that offenders personally face what they have done and, at

> least partially, atone for their legal
> transgressions by direct action in the form
> of a positive personal performance.  Congress
> requires, however, that when restitution is
> indicated the district court consider both
> the loss sustained by the victim and the
> offender's financial resources, financial
> needs, and present and potential earning
> ability.  18 U.S.C. § 3664(a).

1995 WL 75853, at *3 (footnotes omitted).

We have consistently required district courts "`to make specific findings as to the factual issues that are relevant to the application of the restitution provisions of the [Victim and Witness Protection Act, 18 U.S.C. §§ 3579–3580 (1982)].'" United States v. Logar, 975 F.2d 958, 961 (3d Cir. 1992) (quoting Palma, 760 F.2d at 480).  While it is certainly appropriate for a district court to consider a defendant's ability to earn income in the future, restitution is only appropriate in an amount that the defendant can realistically be expected to pay.  Logar, 975 F.2d at 964.

The district court erred by relying solely on its conclusory statement that, "she is working now and that in the future, at least over the period of supervised release, she'll be able to pay some portion of the restitutionary obligation that would be due her."  App. at 39.  This finding does not adequately support the restitution order.  We can foresee no possibility on the facts in the record that Hunter will be able to make the $75,000 restitution payments during the three years of supervised release, given Hunter's salary and reasonable expenses.[1]  While

_____

[1].  The presentence investigation report provides a summary of Hunter's financial condition.  The district court adopted the

it is true, as the Government argues, that a district court may "aim high" in calculating a restitution order, the amount of $75,000 appears to be unfounded in light of Hunter's limited resources and future ability to pay.[2]

We next discuss the significance of the district court's statement that "[t]his restitutionary obligation is jointly and severally with those of her co-defendants."  App. at 59.  It is not clear from the record whether the district court intended for Hunter to be individually responsible for the $75,000 restitution, or whether Hunter was jointly and severally liable with the other defendants.  We note that Guzman had been

(..continued)
factual findings in the presentence report.  App. at 66, 72.  The report states that on April 9, 1994, Hunter provided the probation office with a personal financial statement that reflects that she has no assets other than personal furniture and clothing.  Her debts include a delinquent college loan amounting to $3,125 and restitution of $18,000 ordered by the Middlesex County Superior Court.  A review of Hunter's credit report by the probation office verified the delinquent student loan.  Hunter does not have any other history of credit cards, lines of credit or financial history because all of her previous debts were cleared by a bankruptcy order.  Hunter filed for personal voluntary bankruptcy under Chapter Seven of the Bankruptcy Code. The debt listed on the bankruptcy application amounted to approximately $15,000.  Hunter's net salary per month is $1,806. Her necessary monthly living expenses for rent, food, utilities, telephone and restitution amount to $1,210.  The report concludes that Hunter has a positive monthly cash flow of approximately $600.  Nothing in this record would indicate that she has additional resources or other ability to discharge the obligation of restitution.

[2].  We do not mean to suggest that a district court must conduct a full-blown evidentiary hearing and make such precise findings regarding a defendant's income and expenses as often occurs in matrimonial litigation.  However, we must insist that in crafting the ultimate restitution order, the district court consider the reasonable expectation of payment.

sentenced to $7,000 in restitution, and we cannot comprehend on this record joint and several liability where the amount of restitution ordered for each defendant is different.  We do not mean to imply that joint and several liability is improper as a matter of law or inappropriate under the facts of this case.[3]  We agree with well-settled law that the state's interests in justice and rehabilitation should allow a district court the discretion to impose joint and several liability on multiple defendants.  See, e.g., United States v. Harris, 7 F.3d 1537, 1540 (10th Cir. 1993); United States v. Chaney, 964 F.2d 437, 453-54 (5th Cir. 1992); United States v. Van Cauwenberghe, 827 F.2d 424, 435 (9th Cir. 1987), cert. denied, 484 U.S. 1042, 108 S. Ct. 773 (1988); United States v. Tzakis, 736 F.2d 867, 871 (2d Cir. 1984).  Nor does the joint and several liability necessarily have to mirror the precise culpability of each co-defendant when imposing restitution.  See, e.g., United States v. Hand, 863 F.2d 1100, 1106 (3d Cir. 1988) (in ordering restitution, the fact that burden of restitution laid entirely on one co-defendant where two co-defendants were equally culpable did not offend the Constitution and "certainly, did not constitute an abuse of discretion").

---

[3].  We do not foreclose that in fine-tuning orders of restitution among co-defendants with varying degrees of culpability in criminal conduct, a resourceful district court could fashion an order of restitution based on credit to be given to one defendant for the restitution paid by co-defendant, and other similar refinements.  If a complicated case calls for an imaginative restitution scheme, we merely observe that the discretion of a district court in these matters is broad, so long as the district court comports with 18 U.S.C. § 3664(a) and the principles announced by this Court.

However, even if the restitution order were joint and several, the district court must nevertheless make specific findings on whether Hunter will realistically be able to pay the full restitution amount. Accordingly, we will remand this matter to the district court to take evidence and make findings as to the amount of restitution that Hunter can realistically be expected to pay.

CONCLUSION

For the foregoing reasons, the order of the district court enhancing Hunter's sentence by two points as a manager/supervisor will be affirmed. However, because the record does not adequately support the order of the district court setting restitution in the amount of $75,000, we will reverse and remand with instructions to hear evidence, make factual findings, and enter a new order in an amount appropriate and consistent with this opinion.