**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**James TRIGG, Todd Warren and Stephen
C. Krex, Defendants–Appellants.**

Nos. 96–1487 to 96–1489.

United States Court of Appeals,
Seventh Circuit.

Argued Nov. 4, 1996.

Decided July 8, 1997.

Andrew B. Baker, Jr. (argued), Office of the United States Attorney, Dyer, IN, for plaintiff–appellee.

Bradley L. Williams, Robert A. Anderson (argued), Suzanne Crouch, Ice, Miller, Donadio & Ryan, Indianapolis, IN, for James Trigg.

Thomas F. Strickler (argued), Mishawaka, IN, for Todd Warren.

Glenn Seiden (argued), Seiden & Associates, Paul Goodman, Chicago, IL, for Stephen C. Krex.

Before BAUER, RIPPLE and MANION, Circuit Judges.

RIPPLE, Circuit Judge.

The defendants were convicted of various federal offenses because of their involvement in a conspiracy that engaged in stealing,

transporting and selling computer equipment. James Trigg pleaded guilty to the charges. Todd Warren and Stephen Krex were found guilty after a jury trial. Mr. Trigg and Mr. Warren appeal aspects of their sentences. Mr. Krex appeals his conviction. We modify the district court's orders of restitution in each case. In all other respects, we affirm the judgments of the district court.

## I

## BACKGROUND

James Trigg and his confederates—Todd Trigg (his son), Todd Warren (his codefendant and Todd's friend), Patricia Zowacki (his mother), Brian Cornwall (Todd's friend), and Christina Steinbergs (Todd's girlfriend)—stole computers and computer printers from retail stores. In its early days, the shoplifting ring would steal printers from Office Max and sell them through advertisements placed in local newspapers. Mr. Trigg's gang later turned its attention solely to Best Buy stores, where, Todd Trigg had discovered, the security was lax and more inventory was within reach.

The conspiracy's modus operandi changed over time. In the beginning, Mr. Trigg would legally purchase a printer and obtain a valid receipt. With that receipt he would walk out of the store with other printers for which he had not paid. The shoplifting ring thereafter began to employ other methods of operation. For example, sometimes one of the group's members would purchase an inexpensive item; the security tape would then be removed from that item and placed on a printer which could then be carried away with less chance of detection. In order to place the security tape on the printer boxes while in the store, the thieves would remove the boxes to areas in the store that were not covered by camera surveillance.

In September 1994, Stephen Krex, who owned Krex Computers in Illinois, responded to one of Mr. Trigg's newspaper ads. Mr. Trigg quoted Mr. Krex a price that was 40 percent lower than Best Buy's retail price—indeed, the quoted price was lower than the price Best Buy had paid. In response, Mr.

Krex informed Mr. Trigg that he would buy all of Mr. Trigg's equipment. During this conversation, Mr. Trigg claimed that he had obtained a computer store in Atlanta that had been owned by his recently deceased father.

On September 7 Mr. Trigg brought fifteen stolen printers to Krex Computers in Illinois. Mr. Krex received the goods. He photocopied Mr. Trigg's driver's license and wrote down other personal information about Mr. Trigg. Mr. Krex also had Mr. Trigg fill out a form stating that there were no liens on the equipment so as to protect Mr. Krex, he said, in the event the printers were stolen. Upon paying Mr. Trigg with a $8,450 check, Mr. Krex suggested to Mr. Trigg that it would be less suspicious to cash the check at a currency exchange if Mr. Trigg were planning on hiding the money from the Internal Revenue Service. Mr. Krex further told Mr. Trigg to remove his ads from the newspapers as he (Mr. Krex) desired to buy all of the printers in Mr. Trigg's possession.

Mr. Trigg began to deliver stolen printers to Mr. Krex on a weekly basis. The printer boxes that were delivered to Mr. Krex had tears on them where the Best Buy labels had been removed. When Mr. Trigg complained about the cash checking fee at the currency exchange, Mr. Krex began including an extra amount in the payment checks to cover the fee. When Mr. Trigg informed Mr. Krex that a man at the currency exchange had advised that it would be beneficial not to cash checks in amounts greater than $10,000, Mr. Krex began paying with separate checks if the total purchase price for a shipment was over $10,000. Mr. Krex also requested that Mr. Trigg bring more of the models of printers that were popular with the customers of Krex Computers.

In December Mr. Krex asked Mr. Trigg if he had access to any items other than printers. Mr. Trigg responded that he did and thereafter began delivering stolen computers to Mr. Krex. Mr. Trigg's asking price for the stolen computers was 50 to 60 percent below Best Buy's retail price. On occasion, Mr. Trigg would inform Mr. Krex of Best Buy's price and offer his opinion that Best Buy had the lowest prices in town. Ms. Steinbergs

testified that Mr. Krex was happy when the group delivered a large amount of stolen equipment and was disappointed and upset when the group did not. Mr. Krex, on several occasions, told Mr. Trigg to bring all the equipment that he could muster.

Todd Warren joined the operation in early 1995. Mr. Trigg testified that, when the group went on one of its stealing sprees, Mr. Warren would "always" go into the store and carry out computers or printers. Trial Tr.I at 69. (He testified that Todd Trigg would go into the store about 50 percent of the time.) Mr. Trigg also bought Mr. Warren a van, which was used to transport the stolen equipment from the targeted stores. Mr. Warren drove the van after the heists and held the title to the van in his own name.

After Mr. Trigg broke up with his ex-wife, she wrote the FBI about Mr. Trigg and his gang's activities. The FBI stopped the gang for questioning in March 1995. Mr. Trigg later informed Mr. Krex of the stop, at which time Mr. Krex had no further dealings with Mr. Trigg. The FBI investigation eventually culminated in the defendants' indictment. Each was charged with three counts: (1) conspiracy in violation of 18 U.S.C. § 371; (2) transportation of stolen goods in violation of 18 U.S.C. § 2314; and (3) the sale or receipt of stolen goods in violation of 18 U.S.C. § 2315. Mr. Trigg pleaded guilty and testified against his cohorts at trial. He was sentenced to 64 months' imprisonment and a period of supervised release. He was ordered to make restitution in the amount of $79,582.40, one-tenth of the loss to Best Buy. A jury returned verdicts of guilty against Mr. Warren and Mr. Krex. The court sentenced Mr. Warren to 33 months in prison and a period of supervised release. The court ordered him to make restitution in the amount of $3,018.50, one percent of the loss attributable to him (which was less because he had joined the conspiracy later). The court sentenced Mr. Krex to 39 months' im-

prisonment and supervised release and ordered him to pay restitution in the amount of $795,824, an amount equal to Best Buy's entire loss.

## II

## DISCUSSION

### A. United States v. Trigg, No. 96–1487

#### 1. Restitution

█ Sections 3663 and 3664 of Title 18 [1] empower the district courts to order certain defendants to make restitution to the victims of their offenses. We review the decision to order restitution for an abuse of discretion. *United States v. Murphy*, 28 F.3d 38, 40 (7th Cir.1994). In deciding whether to order restitution and, if so, in what amount, the district court "shall consider the amount of the loss sustained by any victim as a result of the offense, the financial resources of the defendant, the financial needs and earning ability of the defendant and the defendant's dependents, and such other factors as the court deems appropriate." 18 U.S.C. § 3664(a). "We shall sustain the district court's order of restitution if it is apparent that the district court considered the statutory factors." *Murphy*, 28 F.3d at 41. Therefore, to prevail on his claim that the district court failed to consider his ability to pay restitution in the amount ordered, Mr. Trigg "must show either that (1) it is not improbable that the judge failed to consider the mandatory factor and was influenced thereby, or (2) the judge explicitly repudiated the mandatory factor." *Id.*

█ Mr. Trigg first contends that the district court's order to repay over $79,000 to Best Buy cannot be squared either with the court's factual findings that Mr. Trigg has few assets and job skills or with its decision to forego the imposition of a fine. Mr. Trigg points out that he will be 54 years old when released from prison and has no legitimate

---

1. Sections 3663 and 3664 of Title 18 have been amended extensively since Mr. Trigg's conviction, and a new section, 18 U.S.C. § 3663A, has been added which makes restitution mandatory for offenses against property, including offenses committed by fraud. The amendments and the new section are effective for sentencing proceed-

ings only in cases in which the defendant was convicted on or after April 24, 1996. Mr. Trigg was convicted before that date, so the amendments and the new section do not apply to his case. Our discussion in this opinion refers to §§ 3663 and 3664 as they existed prior to their amendment unless otherwise indicated.

job skills. He is a high school dropout and has supported himself through theft and gambling throughout his life. He notes that he was discharged from the military for bad conduct. Mr. Trigg urges that these findings demonstrate that he is unable to pay restitution now or in the future.

At the outset, it is clear that the district court considered these facts—which, in the parlance of § 3664, relate to Mr. Trigg's "financial resources" and to the "financial needs and earning ability" of Mr. Trigg and his dependents—as required by § 3664(a). At the sentencing hearing, the district court explicitly mentioned the factors listed in § 3664(a). It then noted that the amount of loss, $795,824, was a lot of money and that Mr. Trigg, at the time, had no financial resources except for some used furniture. Although he concedes that the district court considered these facts, Mr. Trigg invites our attention to the cases in which we have vacated "sham" restitution orders, that is, orders requiring the payment of a large sum even though the district court's factual findings make clear that the defendant has no real hope of complying with the order. *See, e.g., United States v. Jaroszenko,* 92 F.3d 486, 491–92 (7th Cir.1996); *United States v. Lampien,* 89 F.3d 1316, 1323–24 (7th Cir. 1996); *United States v. Johnson–Wilder,* 29 F.3d 1100, 1105–06 (7th Cir.1994); *Murphy,* 28 F.3d at 41; *United States v. Ahmad,* 2 F.3d 245, 247–48 (7th Cir.1993); *United States v. Studley,* 892 F.2d 518, 532–33 (7th Cir.1989); *United States v. Mahoney,* 859 F.2d 47, 50–52 (7th Cir.1988). We have also held, though, that a defendant's indigence is only one factor the court must consider; that a defendant currently may be poor is not decisive in the restitution determination. *See United States v. Viemont,* 91 F.3d 946, 951 (7th Cir.1996); *United States v. Lesperance,* 25 F.3d 553, 558 (7th Cir.1994); *United States v. Boula,* 997 F.2d 263, 268 (7th Cir. 1993).

■ In this case, the district court found, in addition to the facts Mr. Trigg brings to our attention, that Mr. Trigg has "only minimum financial needs of [his] own and no dependents." Sent. Tr. II at 43. As Mr. Trigg points out, the district court noted that, because Mr. Trigg is a high school dropout with no employment history, his "earning ability would appear to be poor at first glance." *Id.* But the court agreed with defense counsel that Mr. Trigg is "a man with some talents" who has "demonstrated that down through the years." *Id.*[2] The court took the view that Mr. Trigg could apply his criminal ingenuity toward legitimate employment and become able to make partial restitution in the future. The court concluded that, although Mr. Trigg could not make full restitution, "these factors warrant an order of $1.00 on every $10.00, or $79,-582.40." *Id.*[3] In assessing the likelihood that Mr. Trigg would become able to pay restitution in the future, the district court properly considered Mr. Trigg's ingenuity and talents. See *Viemont,* 91 F.3d at 951; *United States v. Ross,* 77 F.3d 1525, 1552 (7th Cir.1996); *Lesperance,* 25 F.3d at 558; *Boula,* 997 F.2d at 268–69. A restitution order against a defendant "who is currently unable to pay restitution" will not be vacated "if 'there is some likelihood' that he will acquire sufficient resources in the future." *Viemont,* 91 F.3d at 951 (quoting *United States v. Simpson,* 8 F.3d 546, 551 (7th Cir. 1993)).

In this case, the district court properly considered the statutory factors and tailored the amount of restitution to Mr. Trigg's unique situation. If it turns out that Mr. Trigg is correct and his ingenuity (after all, he points out, his crime was not all that clever—he was a large-scale shoplifter) does not, as the district court predicted, lead to future income sufficient to comply with the restitution order, he may "seek modification of the restitution order in the district court." *United States v. Wilson,* 98 F.3d 281, 285

---

2. At the sentencing hearing, defense counsel had argued, "This man [Mr. Trigg] has some talent that could be used in legal and productive endeavors, and I'm sure he is going to use those in the future...." Sent. Tr.II at 38.

3. Title 18 U.S.C. § 3553(c) provides that, if the district court decides not to order restitution or orders only partial restitution, it "shall include in the statement the reason therefor." 18 U.S.C. § 3553(c).

(7th Cir.1996) (citing *Viemont,* 91 F.3d at 952). The district court demonstrated a thorough assessment of the record and an awareness of all pertinent factors that ought to be considered in making the determination as to what restitution ought to be awarded. *See Lesperance,* 25 F.3d at 558 (holding that "district court considered [the defendant's] financial condition and properly exercised its discretion" in case in which defendant "had a negative net worth and a monthly cash flow of zero"); *Simpson,* 8 F.3d at 551 (affirming restitution order for over $4 million because "[t]he district court clearly considered the mandatory factors of financial resources, needs, and earning ability"). The district court's ability to assess the intangible factors that bear on an estimate of Mr. Trigg's capacity for future earnings cannot be—and ought not be—second-guessed by this court.

■ In his insistence that restitution is unwarranted in his case, Mr. Trigg stresses that the district court decided not to impose a fine. In deciding not to assess a fine against Mr. Trigg, the district court stated:

> Because the defendant is not able and, even with the use of a reasonable installment schedule, is not likely to become able to pay all or part of the fine required by the sentencing guidelines, the court imposes no fine, but imposes the foregoing requirement of community service as an alternative sanction....

Sent. Tr. II at 48. Mr. Trigg reminds us that, in *United States v. Ahmad,* 2 F.3d 245 (7th Cir.1993), we remanded because of the inconsistency between the court's ordering restitution and its finding that the defendant could not "pay a fine, any fine, now or tomorrow or in the foreseeable future." *Id.* at 248. We said further in *Ahmad* that "[r]estitution is not a reason to waive the fine ... although the court may consider restitution when selecting a fine within the range." *Id.* Importantly, however, we also stated in *Ahmad* that there are some good reasons for ordering restitution while foregoing a fine. *Id.* We explained further in *United States v. Berman,* 21 F.3d 753 (7th Cir.1994), that one

such permissible reason is "that the defendants might be able, with luck and energy ..., to pay either fines or restitution but not both, and that the latter is more important because it will go to compensate the principal victims of their crimes." *Id.* at 758. In other words, a district court may rightly withhold a fine if the payment of that fine on top of restitution "would be the straw that broke the camel's back." *Id.* Title 18 U.S.C. § 3572(b), after all, provides that a district court "shall impose a fine ... only to the extent that such fine ... will not impair the ability of the defendant to make restitution." 18 U.S.C. § 3572(b). We remanded in *Berman* because the district court had failed to provide a reason for its ordering restitution but not a fine. 21 F.3d at 759.[4] In Mr. Trigg's case, unlike in *Berman,* the district court furnished a reason for its order. At the sentencing hearing, the court, after calculating what the amount of the fine would be, stated that Mr. Trigg could not pay that amount, "at least certainly not in addition to the restitution." Sent. Tr. II at 44. The district court thus decided that Mr. Trigg could not pay both a fine and partial restitution and gave a preference to the victim of Mr. Trigg's crimes. *Berman* allows such a preference as long as the district court explains its rationale.

■■ Mr. Trigg next contends that the district court erred in giving too much discretion to the probation officer to set a schedule for the payment of the restitution. One provision of Mr. Trigg's supervised release is that he cannot incur credit charges or open new lines of credit "without the probation officer's approval unless [Mr. Trigg] is in compliance with any installment schedule upon which [Mr. Trigg] and the probation officer may agree for the payment of the restitution order." R.143 at 3. Mr. Trigg submits accurately that a district judge may not "delegate[ ] to the probation department its authority to establish a payment schedule." *United States v. Murphy,* 28 F.3d 38, 42 (7th Cir.1994); *accord United States v. Mohammad,* 53 F.3d 1426, 1438–39 (7th Cir.

---

4. In doing so, we explained that *"Ahmad* holds that when a district judge orders restitution while withholding a fine on the ground of the defendant's inability to pay, and fails to explain his action, the case must be remanded for an explanation." *Berman,* 21 F.3d at 759.

1995); *Ahmad,* 2 F.3d at 248–49; *United States v. Boula,* 997 F.2d 263, 269 (7th Cir. 1993). "The fixing of restitution payments is a judicial act"; "a court abdicates its judicial responsibility when it authorizes a probation officer to determine the manner of restitution." *Mohammad,* 53 F.3d at 1438.

Yet Mr. Trigg's restitution order does not, on its face, provide that the probation officer shall establish a repayment schedule. Instead, it states simply that restitution shall be "due immediately." R.143 at 5. To be sure, the above-quoted provision of Mr. Trigg's supervised release assumes that the probation department may employ an installment schedule when Mr. Trigg is on supervised release. That provision, however, does not expressly delegate the establishment of a payment schedule. Rather, the supervised release provision attaches credit consequences to Mr. Trigg's failure to keep up with an installment schedule during his period of readjustment to living in society. We need not express an opinion today on whether the supervised release provision can be enforced to deny him credit or to land him back in prison. The only question in this case is whether the restitution order improperly delegates the ability to establish a payment schedule to the probation department. By the order's plain operative language, it does not.

■ The district court's reference to a payment schedule could raise the specter that the restitution order for "immediate" payment was a "sham" order, that the district court did not really believe Mr. Trigg would be able to comply with its terms. We have already determined that the district court properly considered the statutory factors in § 3664(a), though, and the district court's reference to a payment schedule does not persuade us otherwise. We noted recently in *United States v. Jaroszenko,* 92 F.3d 486 (7th Cir.1996), that " 'immediate payment' does not mean 'immediate payment

in full;' rather it means 'payment to the extent that the defendant can make it in good faith, beginning immediately.' " *Id.* at 492.[5] As we explained in *Ahmad,* "[i]f immediate payment proves impossible, accommodation will occur in the course of collection." 2 F.3d at 249. If, as in Mr. Trigg's case, the restitution order requires immediate payment and makes payment a condition of supervised release, "the probation officer will assess the defendant's progress toward satisfaction of his debt, and if the defendant is not paying what he can the probation officer will ask the judge to revoke or alter the terms of release. Then the judge may make the order more specific or, if the defendant has not paid what he could in good faith, may send him back to prison." *Id.; see Jaroszenko,* 92 F.3d at 492. Reading the district court's judgment as a whole, we see nothing in it that would contravene the procedures we set forth in *Ahmad* and *Jaroszenko.*

■ Mr. Trigg's final challenge to the restitution order is that the district court exceeded its authority by ordering restitution in an amount that exceeds Best Buy's loss. The parties agree that Best Buy's total loss on account of the conspiracy was $795,824. None of the defendants was ordered individually to pay an amount greater than the loss. Yet, Mr. Trigg points out, when all the restitution orders are added together, the defendants (James Trigg, Todd Warren, Todd Trigg and Stephen Krex) are to pay restitution in the amount of $886,383.14. Mr. Trigg is correct that the total amount of restitution ordered cannot exceed the amount of the loss actually caused. *See United States v. Boyle,* 10 F.3d 485, 492 (7th Cir.1993); *United States v. Brothers,* 955 F.2d 493, 498 (7th Cir.), *cert. denied,* 506 U.S. 847, 113 S.Ct. 142, 121 L.Ed.2d 94 (1992); *see also United States v. Campbell,* 106 F.3d 64, 69–70 (5th Cir.1997); *United States v. Spring,* 80 F.3d 1450, 1463 (10th Cir.), *cert. denied,* —— U.S. ——, 117 S.Ct. 385, 136 L.Ed.2d 302 (1996).

**5.** The district court can, and should in appropriate circumstances, require that restitution be paid within a specified time period or in specified installments. See 18 U.S.C. § 3663(f). As newly amended, § 3664 provides that the district court can order "a single, lump-sum payment, partial payments at specified intervals, in-kind payments, or a combination of payments at specified intervals and in-kind payments." 18 U.S.C. § 3664(f)(3)(A). If warranted by the economic circumstances of the defendant, the court can also order "nominal periodic payments" under the amended version of § 3664. *Id.* § 3664(f)(3)(B).

This proposition follows from the fact that "the ordinary meaning of 'restitution' is restoring someone to a position he occupied before a particular event." *Hughey v. United States,* 495 U.S. 411, 416, 110 S.Ct. 1979, 1982, 109 L.Ed.2d 408 (1990).

 A district court can issue a restitution order under §§ 3663 and 3664 imposing joint and several liability on multiple defendants.[6] *Spring,* 80 F.3d at 1463–64; *United States v. Page,* 69 F.3d 482, 494 (11th Cir.1995); *United States v. Hunter,* 52 F.3d 489, 494–95 (3d Cir.1995) (citing cases). Of course, even when joint and several liability is imposed, victims may not recover an amount in excess of their loss. *Spring,* 80 F.3d at 1464. Otherwise, a victim who, for example, had the fortuity of being defrauded by 100 defendants, each of whom would be liable for the full extent of the loss, would reap an unwarranted windfall. The district court here did not order "joint and several" liability as that term is employed in the law of torts. It instead ordered the various defendants to pay different amounts. Nevertheless, § 3663 is not a torts statute, and we agree with our colleagues in the Tenth Circuit that, under § 3663, a district court may impose joint liability on multiple defendants in different amounts. *See United States v. Harris,* 7 F.3d 1537, 1539–40 (10th Cir.1993) (holding no error in case in which the court made the defendant "potentially liable for the full amount of restitution while ordering his

codefendant to be liable for only one–half of the total amount"). Under this approach, a victim still may not recover an amount greater than the loss. *Id.* at 1539.

 The district court's orders in this case do not provide explicitly that Best Buy's recovery is limited to the amount of its loss. Nor do they say that each defendant's liability for restitution ceases if and when Best Buy receives full restitution. We do not believe, however, that it is plausible to read the district court's orders in any other way. Accordingly, although we affirm the district court's judgments, we also modify them to state explicitly these limitations.[7] In the future, district courts that determine that restitution ought to be imposed in this manner ought to state with more specificity than was done in this case the precise contours of the arrangement. As our colleagues in other circuits have pointed out, the restitution arrangement imposed by a district court might well require that the court become embroiled in the future in its administration. More definitive alternatives would therefore seem preferable in most cases.

### 2. Upward Departure

 The district court departed upward under U.S.S.G. § 4A1.3[8] from criminal history category III to criminal history category IV. The basis of the departure was three prior convictions that were disregarded, on

---

**6.** Although the 1996 amendments to § 3664 do not apply to Mr. Trigg's case, we note that Congress, through those amendments, has provided explicitly for joint and several liability:

> If the court finds that more than 1 defendant has contributed to the loss of a victim, the court may make each defendant liable for payment of the full amount of restitution or may apportion liability among the defendants to reflect the level of contribution to the victim's loss and economic circumstances of each defendant.

18 U.S.C. § 3664(h).

**7.** Although only Mr. Trigg raises the matter, Mr. Warren and Mr. Krex are similarly situated, and we consider the matter to be one of plain error. *See United States v. Mohammad,* 53 F.3d 1426, 1438–39 (7th Cir.1995) (finding plain error in restitution order that was not challenged on appeal); *see also United States v. Lashmett,* 965 F.2d 179, 185–86 (7th Cir.1992) (holding that

district court's failure to consider defendant's financial status before imposing restitution constituted plain error); *United States v. Thompson,* 113 F.3d 13, 15 (2d Cir.1997) (noting that "improperly ordered restitution constitutes an illegal sentence amounting to plain error"); *United States v. Obasohan,* 73 F.3d 309, 311 (11th Cir. 1996) (same).

**8.** Section 4A1.3 provides:

> If reliable information indicates that the criminal history category does not adequately reflect the seriousness of the defendant's past criminal conduct or the likelihood that the defendant will commit other crimes, the court may consider imposing a sentence departing from the otherwise applicable guideline range. Such information may include, but is not limited to, information concerning:
> (a) prior sentence(s) not used in computing the criminal history category....

U.S.S.G. § 4A1.3.

account of their age, in computing Mr. Trigg's criminal history category: (1) a 1969 Canadian conviction for obtaining food and lodging by false pretenses; (2) a 1973 Illinois conviction for possession of stolen property; and (3) a 1982 Indiana conviction for conversion.[9] The district court gave two reasons for departing upward on the basis of these three uncounted convictions: (1) "[T]he convictions that were counted do not reflect the manner in which Mr. Trigg amassed his criminal history points: through the use of his son and his son's friends"; and (2) "Mr. Trigg's calculated criminal history category does not adequately reflect the likelihood that he will commit more crimes." R.141 at 5. We review the district court's decision to depart for an abuse of discretion. *Koon v. United States,* — U.S. —, — — —, 116 S.Ct. 2035, 2046–48, 135 L.Ed.2d 392 (1996); *United States v. Poe,* 96 F.3d 333, 334 (8th Cir.1996) (applying *Koon* in § 4A1.3 context).

Mr. Trigg submits that the court's first reason for departure impermissibly double-counted the involvement of Mr. Trigg's family members in his offense. The district court had previously imposed a four-level offense level enhancement, under U.S.S.G. § 3B1.1, because Mr. Trigg was the organizer or leader of criminal activity that involved five or more people; and his family members were counted in the five or more. The government correctly observes, however, that the § 4A1.3 upward departure was for his family members' involvement in his prior offenses, not for their involvement in the current charges. Additionally, § 3B1.1 does not take into account *who* was organized and controlled by the defendant. It was the district court's view that Mr. Trigg's criminal history category misrepresented the seriousness of his past criminal conduct because it failed to take into account his choice of cohorts: "Mr. Trigg's computed criminal history category is one of a habitual thief, not that of one who

operated a theft academy for young men and trained his son in illegal conduct from kindergarten age to adulthood." R.141 at 5. Section 3B1.1 does not address the district court's concerns in this regard. The district court did not abuse its discretion in determining that criminal history category III underrepresented the seriousness of Mr. Trigg's past criminal conduct.

Mr. Trigg also perceives error in the district court's alternative finding that criminal history category III underrepresented the likelihood that Mr. Trigg would commit future crimes. He suggests that the district court was required to find, but did not, that the three uncounted convictions were similar to the current offenses of conviction. Application note 8 to U.S.S.G. § 4A1.2 provides that convictions too old to count for purposes of determining the defendant's criminal history category can be used to depart under § 4A1.3 "[i]f the court finds that a sentence imposed outside [the relevant] time period is evidence of similar, or serious dissimilar, criminal conduct." U.S.S.G. § 4A1.2, comment. (n.8); *see United States v. Young,* 66 F.3d 830, 837–38 (7th Cir.1995) (noting that uncounted convictions similar to current offense of conviction can support finding that the defendant's criminal history category does not adequately reflect either the likelihood that defendant will commit more crimes or the seriousness of past conduct). Despite Mr. Trigg's suggestion to the contrary, the district court did find explicitly that "[t]he uncounted convictions all involved theft, and so were sufficiently similar to the offense of conviction." R.141 at 4 (citing *United States v. Anderson,* 72 F.3d 563, 565–66 (7th Cir. 1995), *cert. denied,* — U.S. —, 116 S.Ct. 1558, 134 L.Ed.2d 659 (1996)). The court found further that Mr. Trigg's prior encounters with the criminal justice system had failed to deter him from engaging in theft and that additional incarceration was neces-

---

9. Mr. Trigg's prior convictions for conversion in 1985 and for five counts of theft in 1993 were counted in calculating his criminal history category. See U.S.S.G. § 4A1.1(b), (c). Mr. Trigg accumulated additional criminal history points because he was still on probation for the 1993 convictions when he embarked on the conspiracy charged in this case, see U.S.S.G. § 4A1.1(d),

and because the charged crime began less than two years after his release from custody on the 1993 convictions, see U.S.S.G. § 4A1.1(e). Mr. Trigg's six criminal history points placed him in criminal history category III before the upward departure. With six points, Mr. Trigg was one criminal history point away from criminal history category IV before the upward departure.

sary to decrease the possibility of recidivism. These findings support the upward departure.[10] We conclude that the district court's upward departure under § 4A1.3 was a sound exercise of judicial discretion.

B. *United States v. Warren,* No. 96–1488

 Mr. Warren's sole claim on appeal is that the district court erred when it found that Mr. Warren was not a "minor participant" in the conspiracy and therefore was not entitled to a two-level offense level reduction pursuant to U.S.S.G. § 3B1.2. Section 3B1.2 "provides a range of adjustments for a defendant who plays a part in committing the offense that makes him substantially less culpable than the average participant." U.S.S.G. § 3B1.2, comment. (backg'd); *see United States v. DePriest,* 6 F.3d 1201, 1214 (7th Cir.1993). A defendant is entitled to a two-level reduction if, "[b]ased on the defendant's role in the offense," "the defendant was a minor participant in any criminal activity." U.S.S.G. § 3B1.2(b). "We review the district judge's determination regarding a defendant's role in the offense for clear error." *United States v. Boatner,* 99 F.3d 831, 838 (7th Cir.1996).

"For purposes of § 3B1.2(b), a minor participant means any participant who is less culpable than most other participants, but whose role could not be described as minimal." U.S.S.G. § 3B1.2, comment. (n.3). Mr. Warren notes that the conspiracy began in mid–1994, whereas he did not become involved until January 1995. Because the conspiracy came to an end later that same year, he submits, his involvement therein lasted a short time. He insists further that the record shows that he was less culpable than most of his cohorts.

The district court was persuaded that it was "more likely than not that at every Best Buy store visited during Mr. Warren's participation, Mr. Warren entered the store and helped get a computer or printer out." R.139 at 6. It also credited Todd Trigg's testimony that his father's compensation system, which paid more to those confederates who actually carried the equipment out of the

store, rewarded Mr. Warren with more compensation than him (Todd Trigg). Mr. Warren, moreover, held the getaway van's title in his name and paid the insurance premiums on that van. The district court concluded that only James Trigg had more knowledge of the group's criminal activity than Mr. Warren. The court acknowledged that Mr. Warren was involved in the conspiracy for only part of its total life, but found that Mr. Warren "was fully involved during that time." R.139 at 7. The district court concluded that, apart from Mr. Trigg and perhaps Mr. Krex, "Mr. Warren's relative culpability was no less than, and (with respect to James Trigg's mother) may have exceeded, any other participants." *Id.; see United States v. Stephenson,* 53 F.3d 836, 850 (7th Cir.1995) ("The district court need not articulate its comparison on a person by person basis with each member of the conspiracy.").

The district court's findings and ultimate conclusion that Mr. Warren was not a minor participant are supported by the record. Mr. Trigg testified that, when the group went to a Best Buy, Mr. Warren would "always" go into the store and carry out computers or printers. Trial Tr.I at 69. He also testified that Todd Trigg would go into the store only about 50 percent of the time. Mr. Warren drove, and held the title to, the gang's getaway van. Mr. Warren also unloaded the van when the stolen goods were delivered to Mr. Krex. In his brief, Mr. Warren acknowledges that the court's findings are supported by the record by commenting that the witnesses' accounts of the role he played in the conspiracy vary considerably. The court, judging the credibility of the witnesses, chose to believe the account which resulted in its finding that Mr. Warren's culpability was no less than Todd Trigg's, Patricia Zowacki's, Brian Cornwall's, and Christina Steinbergs'. Moreover, because the fact that Mr. Warren participated in the conspiracy for a limited period of time had been adequately taken into consideration in calculating his offense level, it did not have to be taken into account again in determining whether Mr. Warren qualified as a minor

---

**10.** See *United States v. Johnson,* 53 F.3d 831, 835–36 (7th Cir.1995); *United States v. Panadero,*

7 F.3d 691, 697 (7th Cir.1993); *United States v. Schmude,* 901 F.2d 555, 559 (7th Cir.1990).

participant. *See United States v. Lampkins,* 47 F.3d 175, 180–81 (7th Cir.), *cert. denied,* 514 U.S. 1055, 115 S.Ct. 1440, 131 L.Ed.2d 319 (1995). We can discern no clear error in the district court's § 3B1.2 determination with respect to Mr. Warren.

### C. *United States v. Krex,* No. 96–1489

#### 1.Ostrich Instruction

■■■■■ Mr. Krex complains that the district court should not have given the jury the "ostrich" instruction (sometimes referred to as the conscious avoidance instruction or the deliberate indifference instruction). He does not complain about the wording of the instruction. Rather, he maintains that there was insufficient evidence to support the giving of such an instruction. In assessing his claim, "[w]e review the evidence in the light most favorable to the government, making all reasonable inferences in its favor." *United States v. Fauls,* 65 F.3d 592, 598 (7th Cir. 1995), *cert. denied,* —— U.S. ——, 116 S.Ct. 1697, 134 L.Ed.2d 796 (1996). The decision to give the ostrich instruction we review for an abuse of discretion. *United States v. Walker,* 25 F.3d 540, 546 (7th Cir.), *cert. denied,* 513 U.S. 953, 115 S.Ct. 371, 130 L.Ed.2d 323 (1994).

■■■■■ In deciding whether the ostrich instruction was appropriate, we must assess whether there was evidence that Mr. Krex, "knowingly or strongly suspecting that he [was] involved in shady dealings, t[ook] steps to make sure that he d[id] not acquire full or exact knowledge of the nature and extent of those dealings. A deliberate effort to avoid guilty knowledge is all the guilty knowledge the law requires." *Fauls,* 65 F.3d at 598 (internal quotation and citation omitted); *see Walker,* 25 F.3d at 546 ("An ostrich instruction is appropriate when a defendant claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.") (internal quotations and citation omitted); *United States v. Hoyos,* 3 F.3d 232, 236–37 (7th Cir.1993) (same). Here, the government's evidence supported an inference that Mr. Krex consciously avoided knowledge about the nature of his dealings. Mr. Trigg delivered over three–quarters of a million dollars of com-

puter equipment, in varying quantities, to Mr. Krex from September 1994 to March 1995. The erratic frequency of the trips and the other suspicious circumstances of the deliveries were inconsistent with Mr. Trigg's story that he was selling the equipment from his deceased father's computer store in Atlanta. The equipment was delivered in, and loaded off, an unmarked van. The boxes containing the equipment had tears on them where the Best Buy tags had been removed. In addition, Mr. Krex suggested to Mr. Trigg that it would be less suspicious to cash the payment checks at a currency exchange if Mr. Trigg was planning on hiding the money from the IRS. Mr. Krex included an extra amount in the checks to cover the currency exchange's transaction fee. When Mr. Trigg told Mr. Krex that a man at the currency exchange had advised that it would be beneficial not to cash checks in amounts greater than $10,000, Mr. Krex began paying with separate checks in instances in which the total purchase price for a particular shipment was over $10,000. Mr. Trigg's prices were much below Best Buy's retail prices and even below the manufacturer's prices. Herbert Olitsky, who operates a computer store in New York, testified that, at the prices Mr. Krex paid, the merchandise would have to be stolen or damaged. He opined that he would not have bought the equipment at those prices because it would have been "an impossible buy" involving stolen goods. Trial Tr.II at 267–70. Paul Earling, a computer store owner in the Chicago area, testified that he would not have purchased the equipment without proof of a prior legitimate purchase. He opined that Mr. Krex should have done more than merely photocopy Mr. Trigg's driver's license and require Mr. Trigg to fill out a form stating there were no liens on the equipment. Earling testified that, without a bill of sale, he would have presumed that Mr. Trigg's equipment was stolen. The evidence at trial also showed that Mr. Krex bought some stolen computers from Brian Cornwall, one of Mr. Trigg's confederates, after having been told that they were stolen. The circumstances surrounding his dealings with Mr. Trigg must have raised "red flags" in Mr. Krex's

mind that the goods were stolen. *Fauls,* 65 F.3d at 598. The evidence supports the inference that the only way Mr. Krex "could not have known of the illegal activity is by affirmatively avoiding the knowledge." *Id.* at 598–99. We conclude that the district court's giving of the ostrich instruction was proper.

### 2. Sufficiency of the Evidence

■■■■ Mr. Krex's final assertion is that the evidence presented at trial was insufficient to support the jury's guilty verdict. "When considering a challenge to the sufficiency of the evidence, 'the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *United States v. Pearson,* 113 F.3d 758, 761 (7th Cir.1997) (quoting *Jackson v. Virginia,* 443 U.S. 307, 319, 99 S.Ct. 2781, 2783, 61 L.Ed.2d 560 (1979)). To prove conspiracy the government must establish the following elements: "(1) there was an agreement between two or more persons to commit an unlawful act, (2) the defendant was a party to the agreement, and (3) an overt act was committed in furtherance of the agreement by one of the coconspirators." *United States v. Hickok,* 77 F.3d 992, 1004–05 (7th Cir.) (footnote omitted), *cert. denied,* —— U.S. ——, 116 S.Ct. 1701, 134 L.Ed.2d 800 (1996); *accord United States v. Jones,* 950 F.2d 1309, 1313 (7th Cir.1991), *cert. denied,* 503 U.S. 996, 112 S.Ct. 1700, 118 L.Ed.2d 410 (1992).

■■■ Mr. Krex maintains that the evidence at trial demonstrated that he was never a party to the conspiracy, that Mr. Trigg kept him in the dark about the criminal nature of the enterprise. Mr. Krex contends that there was not substantial evidence of either an agreement between Mr. Trigg and Mr. Krex or any intent on Mr. Krex's part to join the conspiracy. We cannot agree. Much of the same evidence supporting the giving of the ostrich instruction applies here. Mr. Krex advised Mr. Trigg to cash his payment checks at the currency exchange (and paid the transaction fee), and, when the purchase was for over $10,000, Mr. Krex paid in multiple checks. After Mr. Krex bought the initial group of printers at prices too good to be true, he told Mr. Trigg that he would buy all of the equipment Mr. Trigg could get and that Mr. Trigg could remove his classified advertisements from the newspapers. Thereafter, Mr. Trigg delivered over three-quarters of a million dollars of equipment to Mr. Krex under suspicious circumstances. Mr. Krex requested certain brands of printers and computers, those brands that were his best sellers. Based on the totality of evidence in this case, a rational jury could have determined that Mr. Krex possessed the requisite intent and joined this conspiracy. Although Mr. Krex does not challenge the sufficiency of the evidence underlying his convictions on the two remaining substantive counts, our review of the record similarly convinces us that a rational jury could have found Mr. Krex guilty of those counts beyond a reasonable doubt on the evidence presented at trial. We have repeatedly said that it is the rare case that will be overturned on sufficiency grounds; Mr. Krex's is not that case.

### Conclusion

The judgments of the district court are modified to provide that the victim Best Buy is entitled to a total restitutionary recovery not to exceed $795,824.00. They are further modified to state explicitly that the restitution obligation of each defendant ceases if Best Buy has received full restitution. In all other respects, the judgments of the district court are affirmed.

AFFIRMED AS MODIFIED.