**UNITED STATES of America, Plaintiff–Appellee,**

v.

**Joseph L. ALGOOD and Wayne Garland, a/k/a Burt Wayne Garland, Defendants–Appellants.**

**Nos. 00–2969, 00–2994.**

United States Court of Appeals, Seventh Circuit.

Argued April 2, 2001.

Decided Sept. 18, 2001.

Before Hon. RIPPLE, Hon. MANION, and Hon. KANNE, Circuit Judges.

## ORDER

Wayne Garland and Joseph Algood were both convicted of mail fraud and of conspiracy to commit mail fraud. On appeal, they challenge the district court's exclusion of impeachment evidence regarding the government's chief witness, the sufficiency of the evidence to support their convictions, and their indictments and jury instructions. Algood also appeals the district court's denial of a sentencing adjustment for being a minimal or minor participant, and both defendants challenge the court's restitution order. We affirm in part and remand in part.

## I.

Wayne Garland and Joseph Algood (collectively, "defendants") were both employees of Algood Chevrolet, a General Motors ("GM") automobile dealership.[1] Garland was the general manager of the dealership, and Algood was, at different times, salesman and floor manager. Algood Chevrolet's business sold cars for personal use, and it also sold cars to fleet purchasers, including police departments. These sales not only enabled Algood Chevrolet to sell more cars, but also increased the visibility of GM cars.

When police departments decided to purchase new cars, dealers were required to submit bids for the contract to the relevant agency, and the dealer with the best bid would be the exclusive provider of fleet vehicles for a period of time. GM used a bid assistance program to increase

---

1. The dealership was owned by Russell and Malvin Algood, relatives of Joseph Algood. Unless otherwise indicated, all references to "Algood" below indicate the defendant, Joseph Algood.

fleet vehicle sales. GM would lower the price charged dealers for vehicles sold to fleet purchasers, enabling the dealer to make a lower bid. Generally, the price for the dealer would be between $2,000 and $7,000 lower per car. According to Walter Campbell, a GM auditor, in order for the bid assistance program to apply GM required that a fleet vehicle must be paid for with funds from the police department, delivered to the police department, and kept for at least six months. These requirements served to prevent a purchaser from buying a fleet vehicle and then re-selling the vehicle for a profit. For the most part, qualified purchasers kept the cars for two to four years.

In 1989, Algood Chevrolet secured the bid to provide fleet vehicles for law enforcement agencies in Indiana. The government presented evidence, however, that Algood Chevrolet would sometimes make it appear that a vehicle had been sold to a police department when in fact it had not. Rather, after purchasing vehicles from GM, Algood Chevrolet would transfer them to the Michigan City Police Department ("MCPD"), which would use the vehicles, but not actually purchase or pay for them. Nevertheless, the vehicles were titled to the MCPD. After a brief period (less than six months), the vehicles would be returned to Algood Chevrolet, which then sold them to the public. The dealership kept the bid assistance, and thus sold the vehicles at a much greater profit. In fact, in some cases there was evidence that the fleet vehicles were not even physically transferred to the MCPD. Algood Chevrolet would title the car to the MCPD and then re-title it to the retail purchaser.

Apparently, the MCPD did not know what the defendants were doing. Rather,

the MCPD was told that it was participating in a "Testing and Evaluation" ("T & E") program, and under this "program" new fleet vehicles would be provided at no cost to the MCPD for a brief period and the MCPD would then test and evaluate them. In fact GM did not have a T & E program; it was an invention of the defendants.

In September 1993, GM did an on-site audit of the fleet program at the Algood Chevrolet dealership and discovered some discrepancies. Following the audit, GM referred the matter to the FBI, where it was assigned to Special Agent Mark Becker. As a result of this investigation, Garland, Algood, and another employee, George Ingram, were indicted on charges of conspiracy to commit mail fraud and mail fraud. Garland and Algood pleaded not guilty, but Ingram pleaded guilty pursuant to a plea agreement, agreeing to testify against Garland and Algood.

Ingram's testimony was a central part of the government's case against Garland and Algood. Before trial, the government filed a motion in limine to exclude evidence of Ingram's 1986 conviction for insurance fraud under Federal Rule of Evidence 609(b) and a motion to exclude "other acts" evidence under Federal Rule of Evidence 404(b).[2] The district court granted these motions in part and denied them in part, permitting cross-examination of Ingram regarding his conviction for two counts of insurance fraud and history of accepting kickbacks while at Algood Chevrolet. However, shortly before trial the district court excluded evidence that Ingram's convictions had been reduced from felonies to misdemeanors, and it excluded extrinsic evidence that Ingram accepted kickbacks.

---

**2.** This latter motion also contained arguments for exclusion in light of Federal Rules of Evidence 608(b) and 609.

Ingram testified at trial that the T & E scheme (sometimes referred to as the "in and out program" by the conspirators) was put together at a meeting in February or March 1993, attended by Garland and Russell Algood. According to Ingram, he had learned from James Elwell, who was in charge of the MCPD fleet, that the MCPD had financial difficulties. Ingram told Elwell he might have a way to assist the MCPD, but would have to check and get back to him. Ingram testified that he discussed the issue with Garland, and that he and Garland agreed to run the "in and out program" with the MCPD. Ingram and Garland then came up with the idea of the T & E program, and Ingram offered Elwell the chance for MCPD to participate in the "program". Unaware that the T & E program was a sham, Elwell agreed.

The jury also heard testimony that Algood Chevrolet made use of "car jockeys" who drove cars to and from Michigan City. Several of these individuals testified at trial that they were instructed by Ingram and Garland to move cars to and from MCPD, and from Algood Chevrolet's fleet lot to its retail lot. One "car jockey" testified that Garland yelled at them for bringing vehicles back from the MCPD to the fleet lot instead of the retail lot. According to Ingram, Algood Chevrolet also paid for "speed titles" for fleet cars that were ultimately sold to retail purchasers. For a fee, these titles were made available more rapidly than regular titles. At trial, the government presented evidence that Garland had signed several checks to James Elwell and the MCPD which bore the notation "titles" and "speed titles."

Another aspect of the alleged scheme involved putting miles on the cars, which Ingram testified would support the titling of the cars to the MCPD. Agent Becker testified that Algood admitted to him that the conspirators would "[r]ack up a thou-sand to 1200 miles" on cars, because "it looks good on paper." Several Algood Chevrolet employees testified to receiving directions from Garland on which cars to drive, and how long to drive them. Garland admitted giving directions to drive vehicles, although he denied the purpose was to put miles on them.

Ingram also testified that if a car was sold at retail before it had been through the T & E program, Algood and Garland would ask him to process a speed title, rapidly titling the car to the MCPD and then to the retail purchaser. In addition, the jury heard testimony from several retail purchasers who had bought cars which had been run through the T & E program. For example, Rick Thompson wished to buy a factory-new truck. Algood let him take home a truck with under 10 miles on the odometer. Thompson told Algood the truck was too expensive, and Algood replied that it would be cheaper if Thompson didn't care if the truck had a used title. Algood then allegedly went to speak to Garland, and then sold him the car at a substantial discount. Thompson testified that the title showed that the truck had been titled to the city of Michigan City, despite its apparent brand new condition.

The jury also heard testimony indicating Algood's involvement. The jury heard from Agent Becker that Algood told him that at one point, Algood realized that the profit in sales commissions was much higher on the new cars being sold as used cars, and that he was not receiving his full commission on those cars. Apparently, Algood Chevrolet was adding a large portion of the bid assistance back onto the paper cost of these vehicles, thus cheating the salesmen out of their full commissions. Algood allegedly told Becker that he went see Garland about it, and had a heated argument with him. Becker testified that Algood came to the realization that he was

being shortchanged in the early 1990's, when he was still a salesman.

During the FBI investigation which ensued, neither Garland nor Algood were cooperative. Garland claimed he had no involvement in the fleet program. Algood initially denied any knowledge of the scheme, then subsequently contacted Becker and admitted, "I essentially gave you the runaround." Algood then described the functioning of the scheme in detail.

On June 15, 1999, a jury found the defendants guilty on all counts. Garland and the government stipulated that GM was owed $146,240.00 in restitution, although Algood did not join the stipulation. Following three sentencing hearings, the district court determined that each defendant was liable for $146,240.00 in restitution. Garland received a four-level sentence enhancement for a role in the offense as an organizer or leader, and Algood was denied a reduction as a minor or minimal participant. Garland was sentenced to 41 months' imprisonment on each count, to be served concurrently, and Algood was sentenced to 27 months' imprisonment on each count, to be served concurrently.

## II.

Defendants appeal, claiming the district court erred in its evidentiary rulings. They also claim the government did not present sufficient evidence to support their convictions and that the indictment and jury instructions were confusing. Algood argues that the denial of a downward adjustment to his sentence was an abuse of discretion. Finally, both defendants contend that the district court's restitution orders did not take into account the defendants' financial circumstances.

### A. Exclusion of Evidence

In an oral ruling, the district court partially granted the government's motions in limine to exclude evidence under Federal Rules of Evidence 404(b),[3] 608(b),[4] and 609.[5] The court did not, however, specify which evidentiary rules justified each exclusion. Defendants' brief on this issue is not especially clear, but they seem to argue that the district court improperly ex-

---

**3.** Rule 404(b) provides:

(b) Other crimes, wrongs, or acts. Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. . . .

**4.** Rule 608(b) provides:

(b) Specific instances of conduct. Specific instances of the conduct of a witness, for the purpose of attacking or supporting the witness' credibility, . . . may not be proved by extrinsic evidence. They may, however, in the discretion of the court, if probative of truthfulness or untruthfulness, be inquired into on cross-examination of a witness (1) concerning the witness' character for truthfulness or untruthfulness, or (2) concerning

the character for truthfulness or untruthfulness of another witness as to which character the witness being cross-examined has testified.

**5.** Rule 609 provides, in relevant part:

(a) For the purpose of attacking the credibility of a witness . . . (2) evidence that any witness has been convicted of a crime shall be admitted if it involved dishonesty or false statement, regardless of the punishment.
(b) Time limit. Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

cluded evidence of Ingram's commission of "some form of deliberate mismanagement in a fleet program on his own prior to the instant offense" and evidence that he continued to run a "similar fraud" after he left Algood Chevrolet.[6] This court reviews the district court's evidentiary ruling for abuse of discretion.[7] *See United States v. Henderson*, 58 F.3d 1145, 1150 (7th Cir. 1995) (Rules 403 and 404(b)); *United States v. Saunders*, 166 F.3d 907, 920 (7th Cir.1999) (Rule 608(b)); *United States v. Hernandez*, 106 F.3d 737, 740 (7th Cir. 1997) (Rule 609). We address each claim in turn.

Defendants argue that a central part of the government's case was the theory that Ingram was unable to commit the fraud on his own because Ingram had to ask permission of Garland. They claim that the district court wrongly excluded evidence that would have refuted the alleged theory. According to the defendants, this evidence should have been admitted under Rules 404(b) and 608(b).

■ First, defendants point to evidence that Ingram engaged in "some form of

deliberate mismanagement in a fleet program on his own prior to the instant offense," although the brief does not specify the precise mismanagement at issue. The government suggests the defendants refer to allegations that Ingram was guilty of sloppy bookkeeping at another car dealership. If so, defendants informed the court that they did not wish to present evidence on the bookkeeping issue, and accordingly this issue was waived. *See United States v. Staples*, 202 F.3d 992, 995 (7th Cir.2000).

It is probable, based on the defendants' citations to the record, that they refer to the exclusion of evidence that Ingram received kickbacks while he was employed at Algood Chevrolet. The record indicates that the district court did allow questioning of Ingram to show that he engaged in such a kickback scheme. However, the district court precluded any extrinsic evidence related to this scheme. In so holding, the district court reasoned that:

> the Defendants are not going to be allowed to put Mr. Ingram on trial through the cumulative and confusing

---

**6.** The defendants' brief also discusses the probative value of Ingram's conviction for insurance fraud, evidence of which the district court admitted under Rule 609. It is not clear whether they challenge any particular district court ruling related to this conviction. However, in 1986, Ingram was charged with wrongfully converting insurance policy proceeds, and he pleaded guilty to two felony counts of theft. His plea agreement provided that his felonies would be reduced to misdemeanors if he completed probation and made restitution, which he did. But the convictions were never reduced. Shortly before trial, Ingram's attorney had Ingram's felonies reduced to misdemeanors, an action which apparently occurred without the government's knowledge. At trial, the district court permitted questioning regarding Ingram's conviction, including questions for the purpose of showing that Ingram had lied about his conviction to an FBI agent. But the court prohibited the defendants from presenting ev-

idence to show that Ingram had his conviction modified because such evidence was unduly prejudicial to the government and only marginally relevant to the question of Ingram's honesty. The defendants' brief mentions the reduction as demonstrating that Ingram's testimony was very important to the government. Assuming the defendants also challenge the exclusion of evidence of the reduction, the district court's determination that this evidence would be unduly prejudicial was not an abuse of discretion under Rule 403.

**7.** The defendants' only mention of the standard of review is a claim that "when a restriction impacts a defendant's Sixth Amendment right to confrontation, review is de novo," citing *United States v. Manske*, 186 F.3d 770, 778 (7th Cir.1999). This, however, does not change the standard of review for the district court's evidentiary rulings. As noted, those rulings are reviewed for abuse of discretion.

production of evidence which pertains only to misdeeds to which Ingram has already confessed and to which, as I understand it, he more likely than not will admit in his testimony in conformity with his statement to Agent Becker as reflected in Agent Becker's 302s.

This ruling was not an abuse of discretion. Unsurprisingly, Ingram did testify that he engaged in a kickback scheme while at Algood Chevrolet, and it was certainly reasonable for the district court to exclude extrinsic evidence on this issue under Rule 608(b), which states that "[s]pecific instances of the conduct of a witness, for the purpose of attacking or supporting a witness's credibility . . . may not be proved by extrinsic evidence."

Defendants claim that additional evidence of Ingram's prior bad acts should have been admitted under Rule 404(b) to refute the government's claim that Ingram could not have acted alone. They apparently claim this kickback evidence shows he had the ability to do so. However, although Rule 404(b) allows for the admission of evidence of wrongful acts in order to "show proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident," it is unclear how this evidence would show any of these things. Whether or not Ingram received kickbacks while employed at Algood Chevrolet, this fact has little bearing on the question of how the Algood Chevrolet administrative hierarchy functioned, particularly respecting the scheme at issue. The mere receipt of kickbacks does not indicate whether the inclusion of the MCPD in the T & E scheme required Garland's permission. Moreover, under Rule 404(b) and Rule 403,[8] the probative value of the evidence must substantially outweigh the danger of unfair prejudice. *See United States v. Robinson,* 161 F.3d 463, 467 (7th Cir.1998). Extrinsic evidence showing Ingram received kickbacks at Algood Chevrolet could be both confusing and cumulative, as the district court noted. In light of the entirely speculative link between Ingram's receipt of kickbacks and his need to ask Garland's permission to implement the T & E scheme, the district court's exclusion of extrinsic evidence on this issue was not an abuse of discretion under Rule 404(b).

■ Next, the defendants argue that the district court abused its discretion by excluding evidence of an alleged "similar fraud" after Ingram left Algood Chevrolet. It appears, again based on record citations, that defendants refer to evidence that Ingram pursued a kickback scheme at another dealership after he left Algood Chevrolet. The district court excluded evidence and barred cross-examination of Ingram on this issue, although it permitted the defendants' counsel to question Elwell on whether Ingram engaged in fraudulent conduct after he left Algood Chevrolet.

The defendants note that this court has held that under 608(b), a witness can be cross-examined regarding prior thefts for which he was not charged because "acts of theft . . . are, like acts of fraud or deceit, probative of a witness's truthfulness or untruthfulness." *Manske,* 186 F.3d at 775 (quoting *United States v. Smith,* 80 F.3d 1188, 1193 (7th Cir.1996)) (ellipsis in original). However, we have also explained in the Rule 608 context that "[a]lthough specific instances of conduct may, in the discretion of the court, be introduced for the

8. Rule 403 provides:
   Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

purpose of attacking a witness' credibility, the probative value of such evidence must still outweigh the danger of unfair prejudice, confusion of the issues, or misleading the jury." *Saunders,* 166 F.3d at 920.

The question whether the probative value of evidence of Ingram's "similar fraud" after he left Algood Chevrolet outweighs the danger of unfair prejudice is largely the same question presented regarding Ingram's receipt of kickbacks while he was still employed there. However, evidence of Ingram's receipt of kickbacks after he had left Algood Chevrolet has no connection whatsoever to the issue of whether he needed to ask Garland's permission to implement the T & E scheme at Algood Chevrolet. It also adds little weight to the evidence of Ingram's lack of truthfulness, since the jury heard that Ingram received kickbacks while he was at Algood Chevrolet. It could turn the case, as the district court feared, into a trial of Ingram. The district court did not abuse its discretion in excluding evidence and barring cross-examination respecting Ingram's post-Algood Chevrolet kickbacks under Rule 608(b) or Rule 404(b).

In short, the district court's rulings were not an abuse of discretion pursuant to Rules 404(b), 608(b) and 609. Furthermore, we note that the defendants' brief did not clearly denote the evidence which they thought was improperly excluded, referring in general terms to "some form of deliberate mismanagement" or "similar fraud". Any additional arguments related to the granting of the motions in limine which they may have intended were not properly developed in their appellate brief, and are accordingly waived. *See John v. Barron,* 897 F.2d 1387, 1393 (7th Cir.1990) ("This court is not obligated to research and construct legal arguments open to parties, especially when they are represented by counsel as in this case.").

### B. Sufficiency of the Evidence

■ The defendants also claim that the government presented insufficient evidence to support their convictions. "We have said many times that a defendant making a sufficiency of the evidence challenge bears a heavy burden and faces a nearly insurmountable hurdle." *See United States v. Seawood,* 172 F.3d 986, 988 (7th Cir.1999). The evidence is reviewed in the light most favorable to the government. *See United States v. Montgomery,* 990 F.2d 266, 268 (7th Cir.1993). "And it is not our job to reconsider the evidence or assess the credibility of the witnesses." *Seawood,* 172 F.3d at 988. Instead, the verdict will be overturned " '[o]nly when the record contains no evidence, regardless of how it is weighed, from which the jury could find guilt beyond a reasonable doubt.' " *United States v. Hickok,* 77 F.3d 992, 1002 (7th Cir.1996) (quoting *United States v. Teague,* 956 F.2d 1427, 1433 (7th Cir.1992)). A review of the evidence demonstrates that the defendants have not met this standard.

"In order to prove the elements of a conspiracy, 'the government must establish that (1) there was an agreement between two or more persons to commit an unlawful act; (2) the defendant was a party to the agreement; and (3) an overt act was committed in furtherance of the agreement by one of the coconspirators.' " *United States v. Archambault,* 62 F.3d 995, 999 (7th Cir.1995) (quoting *United States v. Lahey,* 55 F.3d 1289, 1293 (7th Cir.1995)). "Under the standard formulation of the elements of ... mail fraud, the government must prove: (1) the defendant's participation in a scheme to defraud; (2) the defendant's intent to defraud; and (3) the defendant's use of the mail ... in furtherance of the fraudulent scheme." *United*

*States v. Davuluri,* 239 F.3d 902, 906 (7th Cir.2001).

The defendants specifically claim that the government failed to show the necessary knowledge and fraudulent intent to commit mail fraud. They do not challenge the sufficiency of the evidence in support of the other elements of the crimes charged.

The evidence presented in this case, particularly the testimony of Ingram, is more than adequate to demonstrate Garland's intent to commit mail fraud. For example, Ingram testified that he formulated the scheme together with Garland, and that he needed Garland's approval since the scheme involved loaning a substantial number of vehicles without payment. In addition, Beth Jarrett, the dealership's office manager, testified that she told Garland the dealership was violating GM's bid assistance program and noted that Garland then suggested in response that she buy a bid assistance vehicle herself. There was also testimony from car jockeys who stated they had moved vehicles to and from MCPD and from the fleet lot to the retail lot pursuant to Garland's orders. And Ingram testified that Garland instructed him to remove files from the dealership so that GM would not find them. All of these alleged actions are demonstrative of an intent to commit the crimes charged.

■ Likewise, there was more than enough evidence to show that Algood had the requisite intent, when viewed in the light most favorable to the government. FBI agent Mark Becker testified that Al-

good had effectively confessed to his participation in the scheme.[9] [T4:248] And the jury heard testimony that Algood admitted that vehicles were being driven in order to "rack up ... miles" because "it looks good on paper." [240–41] As the government notes, although Algood claims that he was only describing what he had figured out after the events occurred, the jury could reasonably have concluded that Algood's statements to the FBI indicated knowledge and assistance at the time of the fraud. Moreover, three witnesses who had bought cars with titles that had been run through MCPD testified that Algood made statements indicating he understood the T & E program and was willing to use the price advantage from the fraud to sell the cars. Algood allegedly asked one purchaser if he minded receiving a new car with "a used car title." Algood had also had a heated argument with Garland about the dealership's failure to share profits from the bid assistance program with salesmen which, in context, could be interpreted as a dispute over the proceeds of the conspiracy. This evidence indicates that Algood was aware of the scheme, and took actions with the intent of furthering it.

Although the defendants try valiantly to present an innocent explanation for their actions (or dispute the credibility of witnesses like Ingram), this is not enough. While much of the evidence came from Ingram, a man who has a spotted past, it is not the role of this court to make credibility determinations. Indeed, it is not our place to do so "even if the evidence is

---

9. Becker testified as follows:

[Algood] knew what was going on when it was going on. Again, he told me he had a good job. He didn't want to rock the boat. He knew they were going to get caught at this. They were just doing too much too fast. But he was making money and he

didn't want to do anything about it. It was at the time that the operation was taking place. That point during our conversation back on 9–14–97 is as clear today as it was then. There is no doubt. He made it clear. He knew what was going on when it was going on. [Vol. 4 at 248]

'totally uncorroborated and comes from an admitted liar, convicted felon, large scale drug dealing, paid government informant.'" *See United States v. Wilson,* 31 F.3d 510, 514 (7th Cir.1994) (quoting *United States v. Davis,* 15 F.3d 1393, 1398 (7th Cir.1994), *cert. denied,* 513 U.S. 896, 115 S.Ct. 250, 130 L.Ed.2d 171 (1994)); *United States v. Dunigan,* 884 F.2d 1010, 1013 (7th Cir.1989). Here, the record contains sufficient evidence from which the jury could find guilt beyond a reasonable doubt.[10]

## C. The Indictment and Jury Instructions

The defendants also point to various alleged errors which they claim "invited" a conviction absent evidence of the requisite intent. These arguments target the language of the indictment and the jury instructions, particularly the district court's "ostrich" instruction. We begin by reviewing the defendants' objection to their indictment.

### 1. The indictment.

■ Defendants claim their indictment was confusing because it repleaded all of the conspiracy elements of Count I as the first element of Counts II and III (the counts of mail fraud), and repleaded portions of the Count I elements for each of the remaining elements of Counts II and III. They claim that this indictment format, in conjunction with the court's "instructions on conspiracies," led the jury to convict in the absence of sufficient proof of intent as to Counts II and III. The government asserts that because the defendants never challenged the indictment in trial

court, it is reviewed for plain error. *See United States v. Quintanilla,* 2 F.3d 1469, 1476 (7th Cir.1993). *See also United States v. Smith,* 223 F.3d 554, 571 (7th Cir.2000), *petitions for cert. filed,* (U.S. Nov. 14, 2000) (No. 00–7070), (Nov. 15, 2000) (No. 00–7021), (Nov. 15, 2000) (00–7085), (Jan. 16, 2001) (No. 00–8082) (in these circumstances, "[the indictment] is immune from attack 'unless it is so obviously defective as not to charge the offense by any reasonable construction.'") (quoting *United States v. Wabaunsee,* 528 F.2d 1, 2 (7th Cir.1975)). It appears from the record that the defendants never objected to the indictment. The defendants have not responded to the government's claim of waiver, but if they did object they should have informed the court, as it is not our role to search the record for an objection. Therefore, we will review for plain error only.

"To be sufficient, an indictment must state the elements of the crime charged, inform the defendant of the nature of the charges to enable [him] to prepare a defense and allow the defendant to plead acquittal or conviction so as to bar the possibility of future prosecutions for the same offense." *United States v. Torres,* 191 F.3d 799, 805 (7th Cir.1999). In this case, the defendants do not claim that the indictment failed to set forth the elements of the crimes charged or otherwise meet the above standard. Instead, they argue that the overlap in the allegations of Counts I and Counts II and III confused the jury and in doing so made it possible for the jury to find the defendants guilty of mail fraud without the intent or knowledge

---

10. The defendants also claim that there was ambiguity "found in many of the key concepts in this trial." For example, they contend that certain witnesses were confused, and claim that certain terms were misunderstood. This argument, assuming its premises, does not counter the fact that the government presented sufficient evidence, when viewed in the light most favorable to the government, for a jury to convict both defendants of the crimes charged.

on their part necessary to commit the crime.

The defendants do not point to any specific language that would mislead the jury, and the format of the indictment was not confusing. In addition, although the overlap between the allegations in Count I and Counts II and III is substantial, this fact in itself does not prove anything. There is no rule against repleading paragraphs from one count in setting forth another count, and a review of the different counts of the indictment shows that distinct crimes are alleged. Defendants have not demonstrated that Count I failed to set forth the elements of a conspiracy to commit mail fraud or that Counts II and III failed to set forth the elements of mail fraud. Counts II and III make clear that they addressed the execution of the scheme set forth in Count I. Furthermore, the language used is reasonably clear, and all three counts clearly reference the intent requirement for the crimes.

In one sentence of their brief, the defendants further claim that the indictment language "coupled with the Court's instructions on conspiracies created so much confusion that the jury convicted both Defendants in an absence of sufficient proof of intent." The government contends that defendants did not object to the jury instructions in question at trial, in which case this court reviews for plain error. *See United States v. Ray*, 238 F.3d 828, 832 (7th Cir.2001). Again, the defendants did not contest the government's position. They also do not even come close to presenting an adequate argument for us to review the "instructions on conspiracies," providing us merely with the one sentence argument noted above. There is nothing obviously confusing about the instructions (which for the most part were Seventh Circuit pattern jury instructions), and by not developing their argument, defendants

have waived it. *See John*, 897 F.2d at 1393.

### 2. The "ostrich" instruction.

■ Next, the defendants claim that the district court improperly gave an instruction on conscious avoidance of knowledge, also known as an "ostrich" instruction. In this case, the district court instructed the jury:

You may infer knowledge from a combination of suspicion and indifference to the truth. If you find that a person had a strong suspicion that things were not what they seemed or that someone had withheld some important facts, yet shut his eyes for fear of what he would learn, you may conclude that he acted knowingly, as I have used that word. You may not conclude that the defendant had knowledge if he was merely negligent in not discovering the truth.

This court reviews the district court's decision to give the ostrich instruction for an abuse of discretion. *See United States v. Walker*, 25 F.3d 540, 546 (7th Cir.1994). "An ostrich instruction is appropriate when a defendant 'claims a lack of guilty knowledge and there are facts and evidence that support an inference of deliberate ignorance.'" *Id.* (quotation omitted). In addition, in assessing a claim that an ostrich instruction was not appropriate, "'[w]e review the evidence in the light most favorable to the government, making all reasonable inferences in its favor.'" *United States v. Trigg*, 119 F.3d 493, 504 (7th Cir.1997) (quoting *United States v. Fauls*, 65 F.3d 592, 598 (7th Cir.1995), *cert. denied*, 517 U.S. 1199, 116 S.Ct. 1697, 134 L.Ed.2d 796 (1996)).

Here, defendants claimed that they lacked the necessary intent to commit the crimes at issue. In light of the above evidence indicating that Garland and Algood had good reason to be aware of the

fraud in this case, and took actions to further that fraud, there was certainly evidence to support an inference of deliberate ignorance. Therefore, we conclude the district court did not abuse its discretion.

### D. Sentencing

■ Algood claims the district court erred in not granting a decrease in his offense level as a "minimal" or "minor" participant under United States Sentencing Guideline § 3B1.2.[11] Section 3B1.2 provides for either a four or two level reduction: A four level reduction is appropriate "[i]f the defendant was a minimal participant in any criminal activity," and a two-level reduction is appropriate "[i]f the defendant was a minor participant in any criminal activity." A "minimal participant" is one who is "plainly among the least culpable of those involved in the conduct of the group." U.S.S.G. § 3B1.2(a). Application Note 1. A "minor participant" is one who "is less culpable than most other participants, but whose role could not be described as minimal." Id., Application Note 3.

We will reverse the denial of a downward adjustment under § 3B1.2 only if it was clearly erroneous. See United States v. Corral–Ibarra, 25 F.3d 430, 439 (7th Cir.1994). Furthermore, the application of the relevant standards is a fact-intensive analysis, and "[w]here there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous." Id.

Here, the district court found by a preponderance of the evidence that Algood's "participation in the conspiracy and scheme involved repeated acts over a period of time." The court also found credible "the testimony indicating that Defendant

Algood had extensive knowledge of the scheme to defraud General Motors from its inception as opposed to Algood's position at the March 7, 2000 sentencing hearing that he was simply a sales person who was faced with no other choice but to sell these vehicles to willing customers." These were reasonable conclusions. For example, three of Algood's buyers described statements by Algood indicating his full understanding of the scheme, and Algood allegedly told the FBI that it was important to "rack up miles" because "it looks good on paper." Whether or not this evidence could be interpreted differently, the district court's conclusion that a sentence reduction was not merited is certainly a permissible view of the evidence, and accordingly, the district court's denial of a downward adjustment was not clearly erroneous.

### E. Restitution

■ Finally, the defendants challenge the district court's restitution order on the theory that the district court did not accurately assess the defendants' financial resources, and therefore their ability to comply with the order's payment schedule. The district court ordered the defendants to pay $146,240.00 in restitution, in monthly payments of $2,360.00 to commence 30 days after the date of judgment. We review the district court's restitution order for an abuse of discretion. See United States v. McIntosh, 198 F.3d 995, 1003 (7th Cir.2000).

The government argues that under the Mandatory Victims' Restitution Act, 18 U.S.C. § 3663A ("MVRA"), the district court may not consider the defendant's financial status in determining the amount

---

11. Garland also challenged his sentencing enhancement in the defendants' initial consolidated brief, but the defendants filed a corrected copy of their brief which deleted this argument, and therefore we need not address it.

of restitution. *See, e.g., McIntosh*, 198 F.3d at 1003. The MVRA focuses on the loss to the victim. That calculation does not consider the defendant's financial status (only the victim's loss) when arriving at a restitution figure. However, the government's argument is wide of the mark. The basis of the defendants' claim is not that the district court erred in calculating the total amount of restitution due, but that the rate and quantity of the proposed installments to pay that amount fails to take into account the defendants' ability to pay. This is a very different proposition.

The district court must take the defendant's financial status into account when determining a payment schedule for a violation of the Act. *See* 18 U.S.C. § 3664(f)(2)-(3); *McIntosh*, 198 F.3d at 1004; *United States v. Szarwark*, 168 F.3d 993, 997 (7th Cir.1999). Courts have found this requirement satisfied when a sentencing court makes "a factual finding keying the statutory factors [such as ability to pay] to the type and manner of restitution ordered," *United States v. Dawkins*, 202 F.3d 711, 716 (4th Cir.2000), or when the court stated on the record that it had considered the defendant's financial situation in determining his ability to pay, *see United States v. Coates*, 178 F.3d 681, 684 (3d Cir.1999). Here, the defendants argue that the court must not have considered their ability to pay restitution when it set a payment schedule of $2,360 per month, as their finances reveal that they cannot make such payments. The defendants cite to presentence reports indicating they cannot meet the terms of the restitution order. The district court's restitution orders do not evidence any specific indication that it considered the defendants' ability to pay when setting the payment schedules at issue. In light of the district court's apparent failure to indicate any analysis of the defendants' economic circumstances in setting the payment schedule, we cannot tell whether it abused its discretion. Accordingly, this issue must be remanded for a determination of an appropriate payment schedule in light of the required statutory factors.

### III.

In sum, the district court did not abuse its discretion in excluding certain evidence under Federal Rules of Evidence 404(b), 608(b) and 609, there was sufficient evidence to support the defendants' convictions of conspiracy to commit wire fraud and of wire fraud, and the indictment and jury instructions did not constitute error. Also, the sentencing court's denial of a downward adjustment for Algood was not clearly erroneous. Respecting these issues, the district court is AFFIRMED. However, it appears from the record that the district court did not make the necessary inquiry into the defendants' financial status in determining a payment schedule for restitution under the Mandatory Victims' Restitution Act. Accordingly, we REMAND for an appropriate inquiry.